Richard F. DUNCAN, Master Sergeant,
U.S. Air Force Reserve, Appellant,

v.

William R. USHER, Major General,
Commander, Lowry Technical
Training Center, Appellee.

Misc. No. 85–08/AF.
CMR Misc. Dkt. No. 84–05.

U.S. Court of Military Appeals.

Oct. 14, 1986.

For Appellant: *Captain Kevin T. Williams* (argued) and *Lieutenant Colonel Patrick C. Sweeney* (reargued); *Colonel Leo L. Sergi.*

For Appellee: *Lieutenant Colonel Donal F. Hartman, Jr.* (argued and reargued); *Colonel Kenneth R. Rengert, Colonel Andrew J. Adams, Jr., Captain Joseph S. Kistler, Captain Donald A. Plude.*

*Opinion of the Court*

EVERETT, Chief Judge:

I

Appellant, a member of the United States Air Force Reserve serving on active duty, was tried on July 5, 1984, by an Air Force general court-martial at Warner-Robins Air Logistics Center, Georgia, on charges that on various occasions between May 2, 1981, and June 1, 1983, he had raped and committed lewd and lascivious acts upon his adopted daughter, a female under 16 years of age, in violation of Articles 120 and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 920 and 934, respectively.

Prior to entering pleas, defense counsel moved to dismiss the charges for lack of personal jurisdiction. After receiving evidence on the motion, the military judge made findings of fact, which may be summarized as follows:

a. Appellant, who was already in the Air Force Reserve, reenlisted on May 9, 1979, for six years in the Reserve, this being necessary in order for him to enter a four-year active-duty tour for which he had previously applied.

b. Pursuant to 10 U.S.C. § 672(d) and 10 U.S.C. § 678, he was ordered to voluntary active duty in the Reserve for four-years, commencing on June 11, 1979.

c. On June 10, 1983, appellant was "released from active duty and placed on Reserve status" for assignment to the 10th Air Force Headquarters at Bergstrom Air Force Base, Texas.

d. Pursuant to orders issued on June 8, 1983, appellant served "a special tour of active duty for training ... for the period commencing" June 14, 1983, and extending through September 10, 1983.

e. On July 30, 1983, he "applied for extended [active] duty"; he "reenlisted in the Air Force Reserve for six years, effective" September 23, 1983; and he was "voluntarily" ordered to active duty for four years, effective October 1, 1983, "with assignment to Robins Air Force Base, Georgia."

Thereupon, the judge denied the motion. Noting that "no break in the accused's Reserve status" had occurred at any time, the judge ruled that, even though the charges were first filed in 1984—months after Duncan had entered upon his most recent voluntary tour of active duty—the court-martial had personal jurisdiction over him.

After denial of his motion to dismiss, appellant entered pleas of guilty to some of the charges pursuant to a pretrial agreement, and the others were dismissed. Subsequently, the court-martial members sentenced appellant to a dishonorable discharge, confinement for 10 years, total forfeitures, and reduction to the grade of E-1.

The staff judge advocate's post-trial review noted that "[t]he breaks in active-duty periods" between the time of the alleged offenses and the preferring of charges produced "significant jurisdictional issues." As he explained:

On 23 July 1984, the Court of Military Appeals rendered a decision holding that termination of a period of duty also terminates jurisdiction to prosecute a reservist under the UCMJ, unless action "with a view toward court-martial" (i.e., apprehension, arrest, confinement, preferring of charges) has been taken prior to the termination of the reservist's duty status. *United States v. Caputo*, 18 MJ 259 (CMA 1984). In the instant case, all offenses alleged fell within the 11 June 1979 through 10 June 1983 extended active duty tour. Yet, charges were not preferred until 11 April 1984 and 1 May 1984 which was during another period of extended active duty beginning on 1 October 1983. In other words, as pointed out above, there were actually two breaks in periods when the accused was subject to the UCMJ. One occurred between 10 June 1983 and 14 June 1983 when the accused separated from extended active duty and began a special active duty tour for training. The second occurred between the time he completed that special tour on 10 September 1983 and began the next extended four year active duty period on 1 October 1983.

Therefore, whether the military had jurisdiction to try this case would seem to depend on whether the *Caputo* case has retroactive or only prospective application. The Court of Military Appeals decision in *Caputo* was silent on that point.

After extensive discussion of the criteria for retroactivity, the staff judge advocate in his review concluded that *Caputo* "should be applied only prospectively" and that, accordingly, "the court-martial had jurisdiction over the accused in this case."

In his response to the review, the area defense counsel commented that "[t]he reviewer's analysis of personal jurisdiction in this case was correct to the extent that it identified the impact *United States v. Caputo*, 18 M.J. 259 (C.M.A.1984), has if applied to this case"; but he disagreed with the review's conclusion that *Caputo* should be applied prospectively only. In an addendum to the post-trial review, the staff judge advocate adhered to his view that *Caputo* was only prospective in application; and the convening authority accepted this

position and approved the findings and sentence.

Then, Duncan petitioned the Court of Military Review for extraordinary relief in the nature of habeas corpus. In a *per curiam* order, that court denied the petition because "[i]t appears from his petition that he has been on essentially continuous extended active duty with the Air Force since 1979." Unpublished order at 1–2 (emphasis added). In a footnote to this opinion the court also observed that Duncan had "apparently been associated with the Air Force since 1962, when he enlisted for four years of active duty. The day following his active duty, he entered the Air Force Reserve and has served in the reserves ever since." [1]

Subsequently, Duncan petitioned this Court to review the denial of extraordinary relief by the Court of Military Review; and, in turn, we heard oral argument on the writ-appeal petition. Because the Court as then constituted was equally divided on the issue of jurisdiction over appellant, we ordered that, pending reargument when three judges would be available, "he should be released from confinement upon terms and conditions which assure the safety of the alleged victims and witnesses, his good behavior and his availability during further proceedings and in the event the court-martial's jurisdiction is affirmed." 20 M.J. 380 (C.M.A.1985) Now reargument has taken place, and we hold that the court-martial which tried appellant lacked *in personam* jurisdiction.

## II

### A

Like most of the punitive articles of the Uniform Code of Military Justice,[2] Articles 120 and 134, under which appellant was

tried and convicted, apply only to persons subject to the Code, as enumerated in Article 2, UCMJ, 10 U.S.C. § 802. At the time of the offenses, Duncan was on extended active duty subject to the Code, *see* Art. 2(a)(1). He was also on extended active duty at the time of trial; so he was subject to court-martial for any offenses he then committed. The problem here results from the hiatus—the break—in his active duty. The Government contends that jurisdiction was not lost as a result of these breaks. Duncan, of course, takes a contrary position.

As a preliminary to our discussion, we observe that in many ways a difference exists between the status of a person who is simply a member of a Reserve component of an armed service and that of a member who is performing active duty. For example, a reservist is entitled to receive pay for time that he spends on active duty; but generally he has no such entitlement for periods of time when he is not on active duty. *Cf.* 10 U.S.C. § 683. Usually, a Reserve is not entitled to medical and dental care during periods when he is not on active duty, *see* 10 U.S.C. § 1074. Days spent on active duty count in determining entitlement to retired pay; but time spent by a Reserve not on active duty receives different treatment, *see* 10 U.S.C. § 1332(a)(2)(A)(i).[3] If a Reserve dies during a period of active duty or inactive duty for training, he is entitled to a death gratuity—an entitlement which does not exist merely by reason of membership in the Reserve component. *See* 10 U.S.C. § 1475. An injury received by a Reserve while on active duty may permit him to qualify for retirement or separation for physical disability; but no such entitlement would exist merely by reason of membership in the

---

1. The Court of Military Review also noted that appellant "apparently occupied base house at Robins during his assignment there, and left his family there while he was at Bergstrom" on a special tour of active duty running from June 14, 1983, until September 10, 1983. Unpublished opinion at 2.

2. Articles 83 (fraudulent enlistment), 104 (aiding the enemy), and 106 (spies), 10 U.S.C. §§ 883, 904, and 906, respectively, are not limited to persons subject to the Code.

3. According to counsel, Duncan was not even accruing points for retirement purposes, which he could have done while performing inactive duty of various types.

Reserve, *see* 10 U.S.C. § 1201 *et seq.* On the other hand, a Reserve not on active duty would not be subject to the bar against a Federal tort claim that would apply to someone on active duty. *Cf. Feres v. United States,* 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950).

Obviously, in drafting the Uniform Code, Congress was quite familiar with the effect of active-duty status on the rights and duties of Reserves. Moreover, during the hearings on the Uniform Code, it was brought to the attention of the legislators that a significant difference of views existed among the Armed Services as to the need for court-martial jurisdiction. As Felix Larkin, Assistant General Counsel of the Department of Defense reported during Committee hearings, "[T]he Army and Air Force ... felt they did not need jurisdiction over their Reserve personnel while they were on inactive duty." However, the Navy wanted to retain the broad jurisdiction that it already had under 34 U.S.C. § 855, which provided:[4]

> All members of the Naval Reserve when employed on active duty, authorized training duty with or without pay, drill, or other equivalent instruction or duty, or when employed in authorized travel to or from such duty or appropriate duty, drill or instruction, or during such time as they may by law be required to perform active duty or while wearing a uniform prescribed for the Naval Reserve, shall be subject to the laws, regulations, and orders for the government of the Navy.

In line with the Navy view, Article 3(a), as originally drafted, provided that "Reserve personnel ... charged with having committed, while in a status in which they are subject to this Code, any offense against this Code may be retained in such

status or, whether or not such status has terminated, placed in an active duty status for disciplinary action, without their consent."[5] However, this provision for "continuing jurisdiction" was criticized—partly because it would allow Reservists to be pulled "back into the service and away from their business for comparatively minor offenses as a harassing movement."[6]

Mr. Robert Smart of the committee staff suggested to the subcommittee that the provision be amended: *"Try everything in the civil courts you can if the accused is not on active duty and limit prosecutions to major offenses."* (Emphasis added.)[7] Mr. Smart also pointed out: "[T]he ultimate opinion of the committee was that Reserves should continue to be subject to trial for offenses committed while they were on active duty, even after they had returned to an inactive status if the offense were a serious offense and if the civil courts of this country, either State or Federal, had no jurisdiction to try the case."[8]

Thus, Article 3(a), UCMJ, 10 U.S.C. § 803(a), as it was redrafted, authorized military jurisdiction over serious crimes committed by Reserves while on active duty and for which they could not be tried by a Federal or State court. Thus, release from active duty would not preclude court-martial of a Reservist who had committed a serious military offense anywhere[9] or who, while overseas, had committed a serious felony.

As another compromise between having no military jurisdiction over Reserves not on active duty and having jurisdiction even over Reserves who were not on active duty, Article 2(a)(3) was added to the proposed Code. Thereunder, Reserves "on inactive duty training authorized by written orders which are voluntarily accepted by them, which orders specify that they are subject

---

4. Uniform Code of Military Justice: Hearings on H.R. 2498 Before a Subcomm. of the House Armed Services Comm., 81st Cong., 1st Sess. (hereafter House Hearings) 859 (1949).

5. House Hearings at 879.

6. House Hearings at 883.

7. House Hearings at 883.

8. House Hearings at 1262; *see also* H.R. Rep. No. 491, 81st Cong., 1st Sess. 4–5, 10–11 (1949).

9. A military offense would not be subject to trial in a Federal or State court.

to" the Code are subject to trial by court-martial.[10] Thus, with their initial consent, "weekend warriors" who were using expensive and dangerous military equipment could be made triable by court-martial. However, there was no provision for military jurisdiction over other Reserves not on active duty. Instead, the reference in Article 2(a)(1) to "other persons lawfully called, drafted, or ordered into, or to duty in or for training in, the armed forces" seems clearly directed to Reserves ordered to active duty and to National Guardsmen ordered or called for active Federal service.

The discussion of the Code on the floor of the House and Senate is also instructive. When the Code was being considered in the House of Representatives on May 5, 1949, Congressman Brooks[11] explained that Article 2 had been redrafted, so that reservists who were not on active duty would be triable by court-martial only "when on inactive duty training ... pursuant to written orders ... voluntarily accepted and ... specifically" stating that the Reserve member will be subject to the Code. Mr. Brooks also pointed out that Article 3(a) originally had provided for "continuing [military] jurisdiction ... over persons who had returned to an inactive-duty status but had" violated the Code "while on an active-duty status." However, "[t]he *Reserve components voiced strenuous objection to such proposals*"; so the Article was redrafted.[12] (Emphasis added.)

When the Code was discussed in the Senate on February 2, 1950, Senator Kefauver noted that "[u]nder the Articles of War, Reserve personnel on inactive duty" were "not subject to" court-martial jurisdiction; but the Articles for the Government of the Navy were not limited in this same way.[13] The "[C]ode strikes a middle ground between the present lack of jurisdiction of the Army and the extensive jurisdiction of the Navy" by authorizing jurisdiction over Reserves who perform inactive duty under written orders specifying that they will be subject to the Code.[14]

Subsequently, in explaining Article 3 of the Code, Senator Kefauver commented that it helped deal with a problem created by the circumstance that, "after they go on inactive duty," Army reservists could not be tried by court-martial for crimes previously committed while in active status. However, Article 3 would provide "continuing jurisdiction over persons who have been separated from military service *or are on inactive duty*, who, nevertheless, are charged with having committed offenses while in an active-duty status." (Emphasis added.) After reciting the conditions imposed by Article 3(a), Senator .Kefauver emphasized that "there is continuing jurisdiction *only* in those cases" where the conditions are satisfied.[15] (Emphasis added.)

In a letter dated July 13, 1949, to Senator Pat McCarran, Chairman of the Judiciary Committee, Senator Millard Tydings, Chairman of the Armed Services Committee, explained that Article 2 narrows the court-martial jurisdiction possessed by the Navy over its Reserves. He also observed that Article 3(a) filled the jurisdictional gap for three classes of cases, of which one was "Reservists who go on inactive duty." As he observed, "It seems entirely fair that, within the statute of limitations, persons who have committed offenses should not gain an immunity or be excused by virtue of *the administrative act of going off active duty* or being separated from the armed forces."[16] (Emphasis added.) Clearly he did not contemplate that military jurisdiction would exist as to Reserves "going off active duty" unless the conditions of Article 3(b) are satisfied.

---

10. House Hearings at 1261.

11. Congressman Brooks had chaired the House Armed Services subcommittee which studied the proposed Code.

12. 95 Cong. Rec. 5720 (1949).

13. *See* 34 U.S.C. § 855, quoted earlier in this opinion.

14. 96 Cong. Rec. 1356 (1950).

15. 96 Cong. Rec. 1358.

16. 96 Cong. Rec. 1367.

B

In *United States ex rel. Toth v. Quarles,* 350 U.S. 11, 76 S.Ct. 1, 100 L.Ed. 8 (1955), the Supreme Court held that Article 3(a) of the Uniform Code was unconstitutional when relied on as a basis for court-martial jurisdiction over a sergeant who had allegedly committed a homicide in Korea before being discharged from the Air Force. However, this Court later held that the *Toth* decision did not preclude application of Article 3(a) to sustain jurisdiction over a soldier who had committed several serious offenses while a prisoner of war in Korea; then had been discharged, and later had reenlisted. *United States v. Gallagher,* 7 U.S.C.M.A. 506, 22 C.M.R. 296 (1957). As this Court observed, one purpose of Article 3(a) was to change the result reached in *United States ex rel. Hirshberg v. Cooke,* 336 U.S. ˙210, 69 S.Ct. 530, 93 L.Ed. 621 (1949), where a former prisoner of war who had been discharged and reenlisted could not be prosecuted for serious crimes that had preceded the discharge. However, it was clear that the Court did not perceive any basis for "continued jurisdiction" other than Article 3(a).

In *United States v. Wheeler,* 10 U.S.C. M.A. 646, 28 C.M.R. 212 (1959), the Court upheld the jurisdiction of an Air Force court-martial over a Reservist who had committed a homicide in Germany, had been released from active duty, and subsequently had requested and been granted active duty for the express purpose of being tried by court-martial.[17] However, jurisdiction was predicated on Article 3(a); and once again it seems clear that the Court recognized that, unless jurisdiction existed under Article 3(a), it did not exist at all.

In *United States v. Brown,* 12 U.S.C. M.A. 693, 31 C.M.R. 279 (1962), the Court ruled that no jurisdiction existed to try a sailor who had enlisted in the Navy and agreed to serve on active duty for a term of 4 years and for 2 years thereafter in the Ready Reserve, because orders had been validly issued terminating his active duty in the Navy and transferring him to inactive duty in the Naval Reserve. Consistent with the Code's language and legislative history, the Court did not seek to predicate jurisdiction on the accused's continued membership in the Reserves. It stated:

In sum, then, we hold that termination of a person's active duty status by delivery to him of competent orders effective on the day of such delivery, serves to end jurisdiction to try him by court-martial, just as if his entire service obligation had been completed by delivery of a valid discharge.

12 U.S.C.M.A. at 695, 31 C.M.R. at 281.

C

The lesson to be learned is that, under Article 2(a)(1), Congress granted jurisdiction over Reserves who are on active duty and, under Article 2(a)(3), over Reserves who are on inactive duty training under prescribed conditions. Contrary to the position taken by the Court of Military Review, the Uniform Code makes no provision for jurisdiction over someone who is "essentially" on active duty. Like pregnancy, active duty is an all-or-nothing condition: A Reserve either is on active duty or he is not!

III

Once this is recognized, the present case clearly is governed by *United States v. Caputo, supra.* There, at the time of the alleged offenses, the accused had been "in a status which under the Code subjected him to military jurisdiction." 18 M.J. at 266. That status terminated by his release from a short tour of active duty for training. Then later, at the time that he was served with charges, he was again in the status of being subject to the Code, because he was performing inactive duty for training under orders which he had voluntarily accepted and which stated that he would be subject to the Code. *See* Art. 2(a)(3). In holding

---

**17.** Wheeler was under the seemingly erroneous impression that, if he were not tried by a court-martial, he would be extradited to Germany for trial there by a local court.

that Caputo could not be court-martialed, we called attention to the "rule" established by paragraph 11(a) of the Manual for Courts-Martial,[18] whereunder jurisdiction over persons subject to the Code, having once terminated, does not revive upon reentry into the status of being subject to the Code.

When the President promulgated this rule in the Manual (1951), he undoubtedly was aware of the Supreme Court's decision in *Hirshberg v. Cooke, supra.* Perhaps the result in *Hirshberg* was not constitutionally mandated: One who is a service-member at the time of his trial by court-martial would seem to have little basis to complain about the exercise of military jurisdiction, even though the alleged offenses were committed in an earlier period of active service. Indeed, this was the Court's premise in deciding *United States v. Wheeler* and *United States v. Gallagher,* both *supra.*

Nonetheless, irrespective of any constitutional requirement that he do so, the President established in 1951—and continued thereafter—the rule that military jurisdiction does not survive a hiatus in the accused's status as a person subject to the Uniform Code.[19] Perhaps he concluded that Article 3(a) filled the major jurisdictional gaps and that any further narrowing of that gap should be left to Congress. Perhaps he was sensitive to the concern of some reservists and their associations. In any event, the President exercised his authority under Article 36(a) of the Code, 10 U.S.C. § 836; and, just as in *Caputo,* we must apply here the rule he promulgated.

### IV

In line with the position taken in the staff judge advocate's review, government appellate counsel argue that *Caputo* established a new rule which should be applied only prospectively. However, this rule is

grounded in the Supreme Court's 1949 decision in *Hirshberg* and the subsequent incorporation of the rule established by that decision in the Manuals for Courts-Martial (1951 and 1969). All of these events preceded by decades this Court's opinion in *Caputo.*

To merit prospective application, a rule must be new. *Cf. Solem v. Stumes,* 465 U.S. 638, 104 S.Ct. 1338, 79 L.Ed.2d 579 (1984); *United States v. Johnson,* 457 U.S. 537, 102 S.Ct. 2579, 73 L.Ed.2d 202 (1982). Because that prerequisite for prospectivity is lacking, *Caputo* must be given full retroactive effect in this case.

### V

In *Caputo* we commented (18 M.J. at 265–66):

In line with the "total force" concept, the training assignments of reservists have been integrated more closely with the assignments of active-duty personnel. For example, during the Vietnam War, reservists often flew transport planes to Southeast Asia; and they are still used extensively for military transport responsibilities. Although the rationale for such activity may be "on-the-job training," the reservists who perform such duties are also rendering valuable service to the armed forces; and, in doing so, they often are in control of expensive and hazardous equipment, such as ships, airplanes, and tanks.

Because of the importance of reservists to our national security, the President and Congress may decide that the jurisdictional rules which now apply are outmoded. Indeed, we are aware that the Department of Defense has considered this question at some length and has proposed to Congress legislation that will change the jurisdictional rule which must be applied in this case. This proposal is now being considered by both Houses of Congress.

---

18. Manual for Courts-Martial, United States, 1969 (Revised edition); Manual for Courts-Martial, United States, 1951. *See also* Discussion of R.C.M. 202(a), Manual for Courts-Martial, United States, 1984; para. 10, Manual for Courts-Martial, United States Air Force, 1949.

19. In the cases covered by Article 3(a), the rule is superceded.

However, the passage of legislation is for Congress; and we are not authorized to rewrite either the Uniform Code or the Manual for Courts-Martial. Indeed, if we attempted to do so, the resulting damage might be far greater than any possible gain.

## VI

Duncan was released from active duty on June 10, 1983, and received a DD Form 214. That "administrative act" was as binding on the Air Force as was the issuance of the discharge to the accused in *United States v. Howard*, 20 M.J. 353 (C.M.A. 1985). At that point, all personal jurisdiction ceased with respect to any crimes he had committed prior thereto. The only exception was as to offenses which came within the purview of Article 3(a). Because appellant's crimes were committed on a Federal enclave in the United States, they fell within the jurisdiction of a Federal district court. *Cf.* 18 U.S.C. § 13. Therefore, the exception did not apply.

In light of the absence of personal jurisdiction, the findings and sentence adjudged by the court-martial are void. We note that—both at the original argument and the reargument—appellant's counsel stated in response to questions by this Court that Duncan recognizes that, if his conviction by court-martial is set aside on jurisdictional grounds, he will be exposed to prosecution for these offenses in a Federal district court in Georgia, because Warner-Robins is subject to Federal jurisdiction.[20] Nonetheless, he has knowingly chosen to attack this conviction and thereafter to take his chances in another court. If in some way he ultimately loses by his choice, that is not our concern.[21]

## VII

The decision of the United States Air Force Court of Military Review is reversed.

20. If no Federal or State court had jurisdiction over these offenses, then court-martial jurisdiction could be exercised under Article 3(a) of the Code.

21. Of concern, however, is the plight of the alleged victim who may have to undergo the

The petition for extraordinary relief is granted; the findings and sentence are set aside; and the charges are dismissed without prejudice to further criminal proceedings in any civilian court having jurisdiction over appellant and over the offenses.

SULLIVAN, Judge (concurring):

I agree with Chief Judge Everett's excellent resolution of the issue before the Court and join those who urge further examination of these difficult jurisdictional questions by Congress. My purpose in writing is to identify the statutory defects which unfortunately preclude court-martial jurisdiction in this case and to distinguish it from *United States v. Clardy*, 13 M.J. 308 (C.M.A. 1982).

The jurisdictional crevice in which this case falls is one which has been recognized and approved by Congress as part of a legislative compromise. *See* H.R. Rep. No. 491, 81st Cong., 1st Sess. 4–5 (1949). Prior to the enactment of the Uniform Code of Military Justice, only the Navy was authorized by statute to court-martial its Reserve personnel for offenses committed while a Reservist was on active duty but which were discovered after the Reservist returned to an inactive-duty status. 34 U.S.C. § 855. The initial draft of Article 3(a) of the Uniform Code of Military Justice sent to Congress contained a similar provision for all the services to court-martial Reserve personnel. *See United States v. Clardy*, 13 M.J. at 313 n. 9. Under both these provisions, court-martial jurisdiction would exist to try appellant for these offenses. However, Congress considered and chose not to adopt this proposal for expanded jurisdiction over Reserve personnel and repealed its previous broad grant of jurisdiction to the Navy. *See United*

trauma of testifying again. Whether testimony before the court-martial would be admissible at trial in a Federal district court, or whether in some way the trauma can be lessened or avoided, will have to be decided by others.

*States v. Schuering,* 16 U.S.C.M.A. 324, 330, 36 C.M.R. 480, 486 (1966). The redrafted version of Article 3(a), UCMJ, 10 U.S.C. § 803(a), which was eventually enacted and remains unchanged to this day, does not authorize this court-martial.

The argument that jurisdiction can nevertheless be sustained by a literal construction of Article 2 (a)(1), UCMJ, 10 U.S.C. § 802(a)(1), is singularly unpersuasive. This argument generally suggests that Congress rejected the initial proposal for expressly conferring jurisdiction over Reserve personnel because it was already implied in Article 2 (a)(1). The rationale is that, because appellant was subject to court-martial jurisdiction at the time of the offense and at the time of trial, any interim break in active-duty service may be ignored. In view of the decision of the Supreme Court in *United States ex rel. Hirshberg v. Cooke,* 336 U.S. 210, 212–13, 69 S.Ct. 530, 531–32, 93 L.Ed. 621 (1949), such an approach by Congress seems highly improbable. The cornerstone of that decision was that Congress must speak expressly and unambiguously when marking the boundaries of court-martial power. *See also Runkle v. United States,* 122 U.S. 543, 555–56, 7 S.Ct. 1141, 1145–46, 30 L.Ed. 1167 (1887). Moreover, it held that statutes designed similarly to Article 2(a)(1) do not meet this test on their face where breaks in court-martial jurisdiction have occurred. *See Hirshberg v. Cooke, supra* 336 U.S. at 213–14, 69 S.Ct. at 531–32.

Chief Judge Quinn in his opinion in *United States v. Schuering, supra,* did not agree with this approach to Article 2 and further asserted that Article 3(a) was designed to deal only with a discharge or separation from the service. In other words the latter codal provision was a response to the *Hirshberg* case only. However, the legislative history cited by Chief Judge Everett and that which I highlight here shows that Congress intended Reservists as well as Regulars to be covered by Article 3(a) and not by implication in Article 2.

Senator Kefauver spoke to this problem during the floor debate in the Senate on the Code. He stated:

Article 3 represents a new provision in military law. *It provides a type of continuing jurisdiction over persons who* have been separated from military service *or are on inactive duty, who, nevertheless, are charged with having committed offenses while in an active-duty status.* Under the Articles of War, persons who commit serious crimes overseas, such as murder, theft of crown jewels, or mistreatment of American prisoners, or who commit a military offense in this country, may not be tried by court martial or in any court after they have been discharged from the service. *Moreover, Army reservists may not be tried for such crimes after they go on inactive duty.* In a recent Supreme Court case, the case of *United States ex rel. Hirshberg v. Cooke, Commanding Officer* (226 [336] U.S. 210 [69 S.Ct. 530, 93 L.Ed. 621]), [sic] it was held that a person discharged from the naval service cannot be tried by court martial during a subsequent reenlistment for a crime committed during the first enlistment, even though in this case it was 1 day only that he was out of the service. But the same principle would apply if he had been out of the service for 20 minutes only. Of course, the crime committed in the Hirshberg case was not discovered until after the reenlistment, and that, of course, could happen very readily.

By virtue of these inadequate provisions, a considerable number of persons were able to escape trial for serious offenses committed while in the armed services, and it was apparent to the Senate committee that this situation should be corrected. The House committee was of the same opinion. There is in the House hearings a great deal of discussion about abuses which have resulted from this holding by the Supreme Court. *It was felt, however, that the jurisdiction of courts martial should not, in general, be extended to civilians, and for this reason the continuing jurisdiction pro-*

*vided over the types of cases I have described is limited to cases which fall, first, within the statute of limitations; second, which are not triable by Federal courts; and, third, which involve serious crimes calling for a sentence of at least 5 years.* In other words, *there is continuing jurisdiction only in those cases.* This provision would, therefore, correct the inadequate jurisdiction heretofore provided and, at the same time, limit and restrict the jurisdiction to proper areas.

96 Cong. Rec. 1358 (1950) (emphasis added).

Senator Kefauver later included in the record of this floor debate a letter from Senator Millard E. Tydings, Chairman of the Armed Services Committee, to Senator Pat McCarran, Chairman of the Judiciary Committee, which states in part:

You mention that you feel that parts of the code deal with matters within the jurisdiction of your committee and you state, specifically, that you feel article 2 is such a provision. Your comment on article 2 is that it greatly broadens the scope of authority and jurisdiction in military courts. I think you will find that a close scrutiny of the present statutory provisions covering jurisdiction as found in the Articles of War and the Articles for the Government of the Navy disclose that article 2 is, to a large extent, a reincorporation of the present laws and there are no subdivisions of it which can be said to create new jurisdiction or broaden the present authority of either the Army or the Navy, or a combination of both of them. For instance, article 2, subdivision (1) is drawn from present Article of War 2, 10 United States Code, section 1473 (a) and section 12 of the Selective Service Act of 1948.

Article 2, subdivision (2), which reads, "Reserve personnel while they are on active duty training authorized by written orders," etc., is actually a restricted version of the authority heretofore provided for the Navy in 34 United States Code, section 855. Very close attention was given to this article. I am sure you are familiar with the extensive discussion

in the House hearings and our hearings on that single subdivision. For your convenience, I here quote the present Navy jurisdiction and you will note that, by comparison with it, subdivision (2) greatly restricts the jurisdiction.

"S. 855. Naval Reserve, application of laws, regulations, and orders of Navy; disciplinary actions:

"All members of the Naval Reserve, when employed on active duty, authorized training duty, with or without pay, drill, or other equivalent instruction or duty, or when employed in authorized travel to or from such duty, or appropriate duty, drill, or instruction, or during such time as they may by law be required to perform active duty, or while wearing a uniform prescribed for the Naval Reserve, shall be subject to the laws, regulations, and orders for the government of the Navy: *Provided,* That disciplinary action for an offense committed while subject to the laws, regulations, and orders for the government of the Navy shall not be barred by reason of release from duty status of any person charged with the commission thereof: *Provided further,* That for the purpose of carrying the provisions of this section into effect, members of the Naval Reserve may be retained on or returned to a duty status without their consent, but not for a longer period of time than may be required for disciplinary action. (June 25, 1938, ch. 690, title III, p. 301, 52 Stat. 1180.)"

\*　　\*　　\*　　\*　　\*　　\*

Article 3 of the code provides, in general, for a continuing jurisdiction under certain circumstances where jurisdiction has previously attached and was segregated from article 2 for that reason, even though as you pointed out, it generally covers the question of jurisdiction. The problem encountered in connection with this article, and particularly subdivision (a) of it, concerns those types of situations where persons have committed offenses while serving on active duty in the

armed services and who, thereafter, by virtue of some artificial situation, are unable to be tried either by courts martial or the Federal courts. In general, the classes of cases fall into three categories: *(1) Reservists who go on inactive duty* ; (2) persons who are discharged from the service; and (3) persons who, although once discharged, reenter the service. A number of cases falling into these categories have taken place, and it has been found that no jurisdiction resides in any court to bring them to trial. Several cases of this kind received a considerable amount of publicity and you will undoubtedly remember them. For instance, a case falling in the category of reenlistment is the Hirshberg case in the Navy. You will recall that Hirshberg was captured by the Japanese and, after being rescued and returned to this country, was discharged from the Navy and on the same day reenlisted for a new term. There later came to light facts which warranted the charge that he had mistreated fellow-American prisoners while he was a Japanese captive for purposes of enhancing his own fortunes. The alleged acts, of course, occurred overseas, outside the jurisdiction of the Federal courts. The question of whether or not the Navy had jurisdiction to try him for these charges, where the discharge intervened—even though he was out of the service for 1 day only—was settled by the Supreme Court, which held that the Navy had lost jurisdiction by virtue of the discharge. Under these circumstances, no court—military or civilian—had jurisdiction to determine whether or not Hirshberg had committed a serious offense. I think it is noteworthy to point out that the Supreme Court's decision was based entirely on a lack of statutory authority and specifically did not involve a constitutional question.

Another case falling within one of these classifications was the Durant case, in which it was charged that Mrs. Durant, at one time a captain in the WAC, was implicated in the theft of the crown jewels of Hesse. Since the theft was committed in Europe, the civilian courts had no jurisdiction and the question of jurisdiction of the military courts was raised because the facts were not discovered, nor was the trial instituted, until Mrs. Durant was on terminal leave. You will recall, in this case, that it was held that the Army courts martial had jurisdiction, but it is clear that, if the referral for trial had been delayed for another 2 or 3 weeks, when her terminal leave would have expired, Mrs. Durant could not have been tried at all for a very serious crime of which she was ultimately convicted. Providing jurisdiction in this type of case, as this subdivision attempts to do, finds some precedent in the existing Articles of War and Articles for the Government of the Navy, which, of course, give a continuing jurisdiction over certain types of offenses committed while on active duty involving frauds against the Government. (See article of war 94, 10 U.S.C., sec. 1566, and article 14 of the Articles for the Government of the Navy, 34 U.S.C., sec. 1200.)

*Insofar as reservists in inactive duty are concerned, I assume you have already noted from Thirty-fourth* [sic] *United States Code, section 855, that the Navy has jurisdiction over reservists who have previously committed offenses while on active duty.*

*It was for the purpose of covering cases of this type, over which there is no present jurisdiction, that article 3(a) was drafted. It seems entirely fair that, within the statute of limitations, persons who have committed offenses should not gain an immunity or be excused by virtue of the administrative act of going off active duty or being separated from the armed forces. However, it was not intended to extend blanket jurisdiction over cases of this type, or to convey to military courts jurisdiction under these circumstances over every trivial offense. For that reason, the jurisdiction is limited to serious crimes only by virtue of the provision*

40

that the offense must call for a sentence of at least 5 years. In addition, it was felt that where the Federal or State courts have jurisdiction, such jurisdiction should not be disturbed, and there would be no justification in also giving it to the courts martial. For *that reason, it is provided that the courts-martial are to have jurisdiction only if the civil courts do not have it.*

96 Cong. Rec. 1366–67 (emphasis added).

Of course, it can be argued that the legislative history cited above indicates no concern for the reservist who later voluntarily returns to an active-duty status. The suggestion is that Article 3(a) was intended to cover only those reservists who never voluntarily return to active duty. Admittedly, Article 3(a) and its legislative history are not clear on this precise point. However, like the Supreme Court in *Hirshberg,* we are permitted to consider the manner in which jurisdiction has been exercised under this codal article in the past in determining its proper interpretation. *See Hirshberg v. Cooke, supra* at 216, 69 S.Ct. at 533. The cases cited by Chief Judge Everett support an interpretation that Article 3(a) applies to a Reservist returning to active duty. Also paragraphs 11(a) and (b), Manual for Courts-Martial, United States, 1969 (Revised Edition), were in effect at the time of appellant's trial and, as indicated in *United States v. Caputo,* 18 M.J. 259, 266–67 (C.M.A. 1984), they indicate the position then held by the Commander-in-Chief that Article 3(a) was applicable in this situation and court-martial jurisdiction did not exist under this provision.

Finally, an argument is raised that jurisdiction may be found in the present case on the basis of this Court's decision in *United States v. Clardy, supra.* The military judge adopted such a position in his ruling at trial. He said:

MJ: As a result of all this, it's apparent that this accused was in continual reserve status during the period that is alleged in the offenses set forth on the charge sheets, and was on active duty during the periods alleged on the

charge sheets. It is apparent also that this accused, at the time of these offenses that are alleged, was voluntarily on active duty, and it's apparent that the accused is also voluntarily on active duty and has been for some time preceding the date of this convening of the court, and was on active duty at the time that the charges were preferred and referred to trial, and there has been no break in the accused's reserve status during this period of time so as to fall within the decision of *U.S. versus Clardy,* in this court's opinion, because that 23 September 83 reenlistment appears to be one which fits within the exception language to *U.S. versus Clardy* in that it appears that the enlistment of the accused in May of 79 was for six years which, of course, would not be up until May of 85.

Therefore, based on those findings of fact, the court finds that there is jurisdiction over the accused at this time, so your motion to dismiss on the grounds of lack of jurisdiction *in personam* is denied.

Clardy, however, was not a Reservist and this Court found as a matter of law that there was no break or hiatus in his status as a member of the regular armed forces subject to court-martial jurisdiction. *Id.* at 316. Appellant is a Reservist and all parties concede that there were two breaks in his active-duty service, *i.e.,* his status as a person subject to the code, between the time of the offenses and his trial. Accordingly, the *Clardy* decision is not dispositive in his case. *Id.* at 313 n. 9.

In sum, Congress was well aware that there would be breaks in active-duty service of Reservists as well as regular members of the armed forces. It was also aware that a statute then existed which conferred jurisdiction over Naval Reserve personnel after a break in their active-duty status. As a matter of legislative prerogative, it rejected an expansion of this jurisdiction not only for the Reserve personnel of the other services but for members of

the Regular forces as well. It also revoked its previous grant of jurisdiction to the Navy. Its solution, although criticized by the services and others over the years, is Article 3(a), which does not permit appellant's trial.

After exhaustive research on this point, I am convinced that Article 3(a) was Congress' measured and direct response (in 1950) to the outrage at the 1949 Supreme Court decision in *Hirshberg.* In Article 3(a), Congress made sure that a soldier who is charged with a serious crime in a Japanese prison camp (or at any other geographical location outside of the reach of the jurisdiction of an American civilian court) could never escape justice by the simple act of leaving active duty. As outlined above, Congress was aware of the "Reservist" situation that we face in the instant case, but Congress chose to ignore it and not to grant continuing jurisdiction. In my opinion, reconsideration of this solution is long overdue. However, it is for Congress, not this Court, to fashion legislation extending jurisdiction to the instant case.

COX, Judge (dissenting):

I take issue with neither the principal opinion as it pertains to congressional history and the development of the concept of jurisdiction over members of the Armed Forces, nor the concurring opinion. Indeed, as Senior Judge Cook pointed out in his *dubitante* opinion in *United States v. Caputo,* 18 M.J. 259, 273 (C.M.A. 1984), "Congress in 1950 never considered the present amalgamation of the Reserve forces into the total-force concept of today." *Id.* at 275. The answer is not readily available to us. Nevertheless, I cannot agree with the result reached in *Caputo* or in this case because I believe Article 2(a)(1), Uniform Code of Military Justice, 10 U.S.C.

§ 802(a)(1), provides jurisdiction over a servicemember who has not been "discharged" from service. Therefore, I respectfully dissent.

This Court has created a "Jack-in-the-box" concept of jurisdiction, a concept alien to my understanding of Anglo-American jurisprudence. To acquire jurisdiction, one must tag ole Jack while he is out of the box; if Jack gets back in without being tagged, he is safe. This concept belies logic.

I need only answer four questions to determine if this appellant or any other accused is subject to court-martial jurisdiction:

(1) Was appellant subject to the Uniform Code of Military Justice at the time of trial?

Yes. Sergeant Duncan was on extended active duty at the time of trial. Art. 2(a)(1).

(2) Was appellant subject to the Uniform Code of Military Justice at the time of the offense?

Yes. Sergeant Duncan was on extended active duty at the time of the offense. Art. 2(a)(1).

(3) Has there been a termination of his status between the time the offense was committed and the time of trial?[1]

No. Sergeant Duncan was at all times pertinent to this case a member of the Air Force Reserve. His status in the Reserve never terminated. He was "released from active duty," a term of art which the principal opinion equates to termination of status. Article 3(a), UCMJ, 10 U.S.C. § 803(a), is not involved because, in my view, his *Reserve status* never terminated. The rule of law recognized in *United States v. Howard,* 20 M.J. 353 (C.M.A. 1985), is not implicated because Sergeant

---

1. If it were not for the decision in *United States ex rel. Hirshberg v. Cooke,* 336 U.S. 210, 69 S.Ct. 530, 93 L.Ed. 621 (1949), I would only require affirmative answers to questions 1, 2, and 4 to affirm jurisdiction. A combination of jurisdiction over the person and the subject-matter would be sufficient. Then the jurisdiction of a court-martial would be equal to that of every other court exercising criminal jurisdiction in the United States.

Duncan was never discharged from the service.

(4) Are the offenses alleged within the subject-matter jurisdiction of courts-martial?

Yes. Sergeant Duncan pleaded guilty to the rape of his underage step-daughter. The offense took place in on-base, government housing at Warner-Robins Air Force Base, a crime we certainly have recognized as being within the subject-matter jurisdiction of a court-martial. Ergo, I am convinced that the court-martial had jurisdiction to try Sergeant Duncan for the alleged offenses.

I would overrule the "Jack-in-the-box" concept created by the *Caputo* decision. A simple recognition that jurisdiction is not lost over a member of the Reserve solely because an offense is not discovered, or prosecution for the offense is not started, while the Reservist is in an active-duty status *vis-a-vis* Reserve status, is quite logical to me. *"Lex est ratio summa, quae jubet quae sunt utilia et necessaria, et contraria prohibet."* *Black's Law Dictionary*, 819 (5th ed. 1979).[2]

2. "Law is the perfection of reason, which commands what is useful and necessary, and forbids the contrary."