Charles G. WILLENBRING, Staff
Sergeant, U.S. Army,
Appellant,

v.

Colonel Joseph A. NEURAUTER,
Military Judge, and The United
States Army, Appellees.

Misc. No. 97–8029.
Crim.App. No. 97 01127.

U.S. Court of Appeals for
the Armed Forces.

Argued Sept. 10, 1997.

Decided June 30, 1998.

For Appellant: *Captain Vincent N. Avallone* (argued); *Captain Dirk Gifford* (on brief); *Colonel John T. Phelps, II, Lieutenant Colonel Michael L. Walters,* and *Major Leslie A. Nepper.*

For Appellee: *Captain Robert F. Resnick* (argued); *Colonel Joseph E. Ross, Lieutenant Colonel Frederic L. Borch, III,* and *Major Michael J. Klausner* (on brief); *Captain Steven H. Levin* and *Captain Scott R. Lawson.*

### Opinion of the Court

EFFRON, Judge:

Appellant is a member of the United States Army Reserve who seeks dismissal of the charges in his pending court-martial. He has asked us to reverse the decision of the Court of Criminal Appeals denying his petition for extraordinary relief under the All Writs Act, 28 USC § 1651(a). Part I of this opinion sets forth the factual and procedural background of appellant's military service and the present proceedings. Part II considers the constitutional and statutory issues pertaining to court-martial jurisdiction over members of the armed forces in the Reserve Components. Part III addresses the issues raised by appellant concerning the applicable statute of limitations.

## I. BACKGROUND

### A. Appellant's Military Service

Appellant enlisted in the United States Army for a period of 4 years on January 13, 1982. He twice extended that period of enlistment and then reenlisted for a period of 6 years on September 30, 1988. Prior to expiration of that enlistment, on March 9, 1992, appellant requested an early separation to accept a civilian job offer, stating: "I am willing to serve my remaining time in service in the Active Reserves." His request was approved on March 10, 1992, with his separation from active duty to become effective on March 31, 1992.

On March 13, 1992, while still on active duty, appellant signed an enlistment contract with the United States Army Reserve, which noted, among other matters: that his enlistment was "more than an employment agreement"; that he would be "[r]equired to obey all lawful orders and perform all assigned duties"; that he would be "[s]ubject to the military justice system, which means, among other things, that [he could] be tried by military courts-martial [sic]"; and that he would be "[r]equired upon order to serve in combat or other hazardous situations."

Appellant was discharged from active service on March 31, 1992, and began his term of enlistment in the Army Reserve on April 1, 1992. He remained a member of the Army Reserve by virtue of an extension of his 1992 enlistment, followed by a 3–year reenlistment, which began on February 26, 1994.

As a member of the Reserve, appellant's duties included training and instruction in the use of heavy individual weapons systems. Although his pay and allowance records are not part of this record of trial, his NCO Evaluation Reports indicate significant participation in military duties as a member of the Army Reserve.

On February 21, 1997, appellant was ordered to active duty pursuant to Article 2(d), Uniform Code of Military Justice, 10 USC § 802(d), which authorizes activation of a reservist for the purpose of trial by court-martial.[1]

---

1. *See* Part IIB, *infra.* On August 21, 1996, appellant's records were "flagged" pursuant to a "Report to Suspend Favorable Personnel Actions (Flag)." A flagging action precludes various favorable actions, such as a discharge, when a person is the subject of an investigation that may

### B. The Charges Alleging Offenses During Appellant's Period Of Active Duty Service

Charges were preferred against appellant on February 26, 1997, alleging three specifications of rape, in violation of Article 120, UCMJ, 10 USC § 920. The specifications allege that he committed the rapes while on active duty during 1987 and 1988.[2] The first two specifications allege commission of two separate rapes in November 1988 at Fort Belvoir, Virginia. Each of the alleged victims was married to a fellow servicemember. The third specification alleges commission of a rape in September 1987 in the vicinity of Champaign, Illinois. With respect to the third specification, the record does not indicate the relationship, if any, of the victim to the armed forces.

### C. Trial And Appellate Proceedings

The charges against appellant were received by the summary court-martial convening authority on March 5, 1997, and were forwarded through the chain of command for disposition. After completion of a pretrial investigation under Article 32, UCMJ, 10 USC § 832, the charges were referred to a general court-martial on April 30, 1997, for trial "as a non-capital case." The trial proceedings commenced with the arraignment of appellant at Fort Belvoir on May 2, 1997.

At trial, appellant moved to dismiss the charges on the grounds that the court-martial did not have jurisdiction under either Articles 2 or 3, UCMJ, 10 USC §§ 802 and 803, respectively, and that prosecution of the offenses was barred by the statute of limitations set forth in Article 43, UCMJ, 10 USC § 843. The military judge denied both motions, and appellant sought review from the Court of Criminal Appeals through a petition for extraordinary relief. That court denied

the petition on July 23, 1997, without opinion, noting that its action was "without prejudice to petitioner's right to assert the same errors during the course of regular appellate review."

Upon appellant's petition, we heard oral argument on the following issues:

### I

WHETHER THE MILITARY JUDGE ERRED IN FINDING THAT THE COURT HAS JURISDICTION OVER APPELLANT FOR THE ALLEGED OFFENSES NOTWITHSTANDING APPELLANT'S HONORABLE DISCHARGE FROM THE REGULAR COMPONENT OF THE UNITED STATES ARMY ON 31 MARCH 1992.

### II

WHETHER APPELLANT'S HONORABLE DISCHARGE FROM THE REGULAR COMPONENT OF THE UNITED STATES ARMY TERMINATED COURT–MARTIAL JURISDICTION OVER APPELLANT FOR THE ALLEGED OFFENSES.

### III

WHETHER THE MILITARY JUDGE ERRED IN RULING THAT ARTICLE 43, UCMJ, DID NOT BAR A COURT–MARTIAL AGAINST APPELLANT FOR THE ALLEGED OFFENSES.

### IV

WHETHER THE STATUTE OF LIMITATIONS FOR THE OFFENSES ALLEGED AGAINST APPELLANT IS FIVE YEARS.

---

lead to trial by court-martial. *See* Army Regulation 600–8–2, Suspension of Favorable Personnel Actions (Flags) (Mar. 1, 1988). As a result, appellant was not discharged in February 1997 at the end of his most recent 3–year reenlistment in the Reserves. The authority to retain a servicemember beyond the period of enlistment for purposes of trial by court-martial, *see* RCM 202(c), Manual for Courts–Martial, United States (1995 ed.), is not at issue in this appeal.

2. Appellant also has been charged with four rapes by the State of North Carolina. The Army has not sought to exercise jurisdiction over these charges, which pertain to periods in which appellant was a member of the Army Reserve but not on active duty or performing inactive-duty training. *See* Art. 2(d)(2), UCMJ, 10 USC § 802(d)(2).

Based upon the record of the proceedings to date, we hold that the military judge did not err in denying appellant's motions with respect to the jurisdiction of the court-martial and the statute of limitations, for the reasons set forth in the balance of this opinion. Our decision is without prejudice to further consideration of this matter at trial and upon direct review, if any, based on such additional information as may be developed at trial.

## II. COURT–MARTIAL JURISDICTION OVER RESERVISTS

The reserve components perform a critical role in the national defense policy of the United States. *See* 10 USC § 10102. During Operations Desert Shield and Desert Storm, over 245,000 reservists were called to active duty. Of the 541,000 troops actually deployed to the Persian Gulf during those operations in 1990 and 1991, approximately 106,000 were reservists. *See* Department of Defense, Conduct of the Persian Gulf War 471, 482 (April 1992); M. Clodfelter, Warfare and Armed Conflicts 1080 (1991).

The official report of the Department of Defense on the Persian Gulf War provided the following assessment with respect to the reserve components:

> Reserve forces played a vital role, participating in all phases of the Persian Gulf crisis from the initial response through the redeployment of forces. What the Department of Defense (DOD) accomplished in resolving the Persian Gulf crisis simply could not have been done without the full integration of the capabilities of the thousands of Reservists and National Guard personnel who served in combat, combat support (CS), and combat service support (CSS) roles in the theater and elsewhere.

Conduct of the Persian Gulf War, *supra* at 471. Reservists have made a significant contribution to subsequent operational missions, such as Operation Uphold Democracy in Haiti and Operation Joint Endeavor/Decisive Edge in and around Bosnia. *See* Secretary of Defense, Annual Report to the President and the Congress 223–24 (1997). "On any given day in 1997, approximately 25 percent

of Army forces in the Bosnia area of operations were from the Army Reserve and National Guard." *See* Secretary of Defense, Annual Report to the President and the Congress 192 (Report of the Secretary of the Army) (1998).

According to the Secretary of Defense, the reserve components "will continue to play a critical role in the future in satisfying the requirements of the National Military Strategy." 1997 Annual Report, *supra* at 228. The Secretary, in his most recent annual report, underscored the integrated relationship between regular and reserve components in both peacetime and wartime activities:

> Guard and Reserve Forces provide trained units and individuals to fight in wartime and to support the complete spectrum of DoD peacetime operations. Today, Reserve component forces are fully integrated into all war plans, and no major military operation can be successful without their participation.
>
> Because of high operating and personnel tempo demands on the active component (AC), Reserve components are being called upon more frequently and for longer periods in peacetime than ever before. Since this trend is expected to continue, major changes to doctrine, training, education, and matériel are being made throughout the Department to ensure the rapid and seamless deployment of Reserve components.

1998 Annual Report, *supra* at 81.

The increasing dependence of our armed forces upon the Reserves has been underscored by numerous congressional actions, including establishment of authority for the President to order up to 200,000 reservists to active duty for 270 days for any operational mission without requiring a declaration of war or national emergency, 10 USC § 12304, and amendments to the Uniform Code of Military Justice concerning court-martial jurisdiction over reservists for offenses committed while on active duty or during inactive-duty training. *See* Part II.C.3 of this opinion, *infra* (discussing Articles 2(d) and 3). These provisions reflect the vital importance

of the morale, welfare, good order, and discipline of members of the reserve components to the national security of the United States.

Appellant was a member of the armed forces in 1987 and 1988 when he allegedly committed the three charged rapes, including the two involving the spouses of fellow service-members; he was a member of the armed forces in 1996 when he received the order to report to active duty for purposes of standing trial on those charges; and he is a member of the armed forces today.

Appellant does not contest the constitutional power of Congress to authorize court-martial jurisdiction over a servicemember in his position—*i.e.,* a reservist charged with offenses committed during a prior period of military service in a regular component. Rather, his claim is that, because of his honorable discharge from active duty with the regular component of the Army, the statutes in place at the time of the alleged offenses and which are applicable to the charges he now faces preclude exercise of court-martial jurisdiction over offenses committed during his period of active service prior to the date of the discharge, March 31, 1992.

#### A. Constitutional Considerations

■ The jurisdiction of courts-martial is governed by statutes enacted under the con-

stitutional power of Congress to establish "Rules for the Government and Regulation of the" armed forces. U.S. Const. art. I, § 8, cl. 14. Congress and the courts have ensured that military trials are similar in many respects to civilian proceedings, but it is well established that courts-martial—which are authorized by statutes enacted pursuant to Article I of the Constitution—need not provide a military accused with the same procedural rights available to a civilian defendant in a criminal trial conducted under Article III.[3]

■ In view of these differences, both the Supreme Court of the United States and this Court have insisted that courts-martial not exercise jurisdiction beyond that granted by the applicable statutes. As a matter of constitutional law, the Supreme Court has held that Congress may not extend court-martial jurisdiction to cover civilians who have no military status in peacetime, even if they are accompanying United States forces overseas as employees or dependents.[4] Likewise, a court-martial may not exercise jurisdiction over a former servicemember whose relationship with the armed forces has been severed completely as a result of a valid discharge and who is not otherwise in a status that is

---

**3.** For example, civilian juries must reflect a representative cross-section of the community, *see Duren v. Missouri,* 439 U.S. 357, 363–64, 367–68, 99 S.Ct. 664, 668–69, 670–71, 58 L.Ed.2d 579 (1979), whereas court-martial panels are selected by the convening authority on a "best qualified" basis. *See* Art. 25(d)(2), UCMJ, 10 USC § 825(d)(2); *United States v. Tulloch,* 47 MJ 283, 285 (1997)(there is no right to have a court-martial panel drawn from a representative cross-section of the population).

**4.** *See, e.g., Reid v. Covert,* 354 U.S. 1, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957) (no jurisdiction over civilian dependents of servicemembers stationed overseas in peacetime for capital offenses); *Kinsella v. Krueger,* 354 U.S. 1, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957) (same); *Kinsella v. United States ex rel. Singleton,* 361 U.S. 234, 80 S.Ct. 297, 4 L.Ed.2d 268 (1960) (no jurisdiction over civilian dependent of servicemember for noncapital offense); *Grisham v. Hagan,* 361 U.S. 278, 80 S.Ct. 310, 4 L.Ed.2d 279 (1960) (no jurisdiction over overseas civilian employee of armed services for capital offense); *McElroy v. United States ex rel. Guagliardo,* 361 U.S. 281, 80 S.Ct.

305, 4 L.Ed.2d 282 (1960) (no jurisdiction over civilian employees of overseas military forces for noncapital offenses). However, in the foregoing cases, the Supreme Court indicated that the same considerations would not necessarily preclude exercise of court-martial jurisdiction over civilians accompanying the armed forces in time of war. *See also* Art. 2(a)(10), UCMJ, 10 USC § 802(a)(10); *United States v. Averette,* 19 USCMA 363, 365–66, 41 CMR 363, 365–66 (1970) (the phrase "in time of war" is limited to "a war formally declared by Congress"; even though the Vietnam conflict "qualifie[d] as a war as that word is generally used and understood[,] . . . such a recognition should not serve as a shortcut for a formal declaration of war, at least in the sensitive area of subjecting civilians to military jurisdiction"). *Cf. United States v. Anderson,* 17 USCMA 588, 589, 38 CMR 386, 387 (1968) (United States' involvement in Vietnam conflict "constitutes a 'time of war' . . . within the meaning of" Article 43(a), which provides that there is no statute of limitations over certain offenses committed "in time of war").

subject to court-martial jurisdiction. *See United States ex rel. Toth v. Quarles,* 350 U.S. 11, 14–15, 76 S.Ct. 1, 3–4, 100 L.Ed. 8 (1955); *Smith v. Vanderbush,* 47 MJ 56, 58–59 (1997).

A discharge or other separation from military service, however, does not preclude trial by court-martial, as a matter of constitutional law, if, at the time military jurisdiction is exercised, the individual is still a member of the armed forces or is otherwise in a status subject to military law. For example, a prisoner in the custody of the armed forces as a result of a court-martial sentence remains subject to court-martial jurisdiction regardless of a discharge from military service. *See* Art. 2(a)(7); *Kahn v. Anderson,* 255 U.S. 1, 7–8, 41 S.Ct. 224, 225–26, 65 L.Ed. 469 (1921); *United States v. Nelson,* 14 USCMA 93, 94–95, 33 CMR 305, 306–07 (1963). In addition, a servicemember who is discharged before his enlistment expires and immediately reenlists may be tried for pre-discharge offenses occurring during the prior enlistment. *See United States v. Clardy,* 13 MJ 308, 316 (CMA 1982). Likewise, certain statutorily designated categories of military retirees are subject to trial by court-martial, including trial for offenses committed during a prior enlistment, even though they no longer are performing military duties. *See* Arts. 2(a)(4)-(5) and 3(a); *United States v. Sloan,* 35 MJ 4, 7–8 (CMA 1992); *Pearson v. Bloss,* 28 MJ 376 (CMA 1989).

Furthermore, a person who deserts during one period of service and subsequently obtains a discharge for a different period of service is nonetheless subject to trial by court-martial for the pre-discharge, prior-service offense of desertion, even if the discharge was not obtained by fraud, and any other such offense. *See* Art. 3(c); *United States v. Huff,* 7 USCMA 247, 22 CMR 37 (1956). Finally, when a person is charged with obtaining a discharge by fraud, a court-martial has jurisdiction over the offense of fraudulent separation in violation of Article 84, UCMJ, 10 USC § 884; if convicted of obtaining a fraudulent separation, the individual may be tried in a separate trial for all other offenses committed before the fraudulent discharge. *See* Art. 3(b); *United States v. Reid,* 46 MJ 236, 238–39 (1997); *Wickham v. Hall,* 12 MJ 145 (CMA 1981); *accord Wickham v. Hall,* 706 F.2d 713 (5th Cir. 1983).

While appellant was subject to a different version of Article 3(a), *see* Part II.C., *infra,* we note that, under current law, if a person is subject to military jurisdiction at the time of the trial and was subject to military jurisdiction at the time of the offense, that person may be tried for offenses occurring during a prior period of military service. The current version of Article 3(a) provides that, subject to the statute of limitations in Article 43—

> a person who is in a status in which the person is subject to this chapter and who committed an offense while formerly in a status in which the person was subject to this chapter is not relieved from amenability to the jurisdiction of this chapter for that offense by reason of a termination of that person's former status.

This provision makes clear that a servicemember who is discharged from and then reenters the armed forces after a break in service may be tried for offenses that occurred during a prior enlistment, regardless of the intervening discharge.

When Congress enacted the present version of Article 3(a), the statute was given prospective effect, applying only to offenses occurring on or after October 23, 1992. *See* National Defense Authorization Act for Fiscal Year 1993, Pub.L. No. 102–484, §§ 1063 and 1067, 102 Stat. 2315, 2505, 2506 (1992). All the offenses charged in this case are alleged to have occurred before October 23, 1992. In that context, the issue before us is not whether Congress has the power under the Constitution to provide for the exercise of court-martial jurisdiction over appellant, but whether the statutes and regulations applicable to charges alleging offenses committed prior to October 23, 1992, authorize the exercise of jurisdiction in this case.

### B. Jurisdiction Under Article 2

Article 2(a) of the Uniform Code of Military Justice, 10 USC § 802(a) (enacted in 1950 and modified in 1986), lists the persons who are subject to the Code. The primary provision authorizing jurisdiction over reservists is Article 2(a)(1), which includes "other persons lawfully called or ordered into, or to duty in or for training in, the armed forces, from the dates when they are required by the terms of the call or order to obey it." [5]

One of the provisions under which a reservist may be lawfully called to duty in the armed forces is Article 2(d) (enacted in 1986). Under Article 2(d)(1)(B), "[a] member of a reserve component who is not on active duty and who is made the subject of proceedings under ... section 830 (article 30) with respect to an offense against this chapter may be ordered to active duty involuntarily for the purpose of ... trial by court-martial[.]" Congress limited this authority to circumstances where the offenses are alleged to have been committed during a period when the reservist is clearly performing military duties. *See* Art. 2(d)(2)(A) & (B) (authority to activate a reservist under Article 2(d) applies only with respect to offenses committed while the member was "on active duty" or "on inactive-duty training"). The authority to activate a reservist for disciplinary proceedings is further circumscribed by Article 2(d)(4), which provides that it may be exercised only by a general court-martial convening authority in a regular component.[6]

Appellant does not contest the military judge's findings that: (1) he was on active duty as a member of a regular component on the dates of the alleged offenses, as set forth in the Charge and its specifications; (2) he was a member of a reserve component at the time he received his orders to active duty under Article 2(d); and (3) the orders were issued by a regular component general court-martial convening authority. Rather, appel-

lant argues that the court-martial did not have jurisdiction to try him for the charged offenses because Article 2(d) authorizes jurisdiction only over offenses committed while he was on active duty in the reserves, not over offenses that occurred while he was on active duty in a regular component. The Government, on the other hand, argues that Article 2(d) confers unqualified jurisdiction over reservists for any offenses committed while on any active duty, notwithstanding any breaks in military service. This case, therefore, concerns the limits, if any, on a court-martial's exercise of jurisdiction to try reservists for pre-discharge offenses under the statutes applicable to appellant's case.

### C. The Jurisdictional Implications Of The Relationship Between Article 2 And Article 3

 The Government urges us to read the activation authority of Article 2(d) as providing an unqualified grant of jurisdiction over a reservist for any offense committed while on active duty, regardless of any intervening discharge or other break in service. Article 2, however, does not exist in isolation. Consideration also must be given to Article 3, which is entitled "Jurisdiction to try certain personnel." Although the current version of Article 3(a) is broadly worded and encompasses offenses committed by a member of the armed forces during an earlier period of service, the version of Article 3(a) applicable to appellant's case was more restrictive:

> Subject to section 843 of this title (article 43) [the statute of limitations], no person charged with having committed, while in a status in which he was subject to this chapter, an offense against this chapter, punishable by confinement for five years or more and for which the person cannot be tried in the courts of the United States or of a State, a Territory, or the District of Columbia, may be relieved from amenabili-

---

**5.** A provision of more limited applicability, Art. 2(a)(3), which applies to "[m]embers of a reserve component while on inactive-duty training," is not at issue in this case.

**6.** Furthermore, if a reservist is ordered to active duty pursuant to Art. 2(d), confinement may not

be adjudged unless the decision to issue the order has been approved by the Secretary of the Military Department concerned. *See* Art. 2(d)(5)(A).

ty to trial by court-martial by reason of the termination of that status.

(Version prior to amendment in 1992). Issues I and II raise the question whether Article 2(d) provides an unqualified grant of jurisdiction to order a reservist to active duty to stand trial by court-martial for all prior offenses committed while on active duty or whether Article 2(d) must be read in conjunction with Article 3(a).

### 1. Legislative Development And Implementation Of Article 3(a)

The version of Article 3(a) applicable to appellant's case was included by Congress in the Uniform Code of Military Justice enacted in 1950 in response to the decision of the Supreme Court in *United States ex rel. Hirshberg v. Cooke*, 336 U.S. 210, 69 S.Ct. 530, 93 L.Ed. 621 (1949), a case which predated establishment of our Court. *Hirshberg*, which was decided on statutory rather than constitutional grounds, involved a sailor who was serving his third period of enlistment. After his second period of enlistment, which included service during World War II, he was discharged and then reenlisted the next day. *Id.* at 211, 69 S.Ct. at 531.

During his third period of enlistment, Hirshberg was charged with having maltreated fellow servicemembers during his prior enlistment while a prisoner of war of Japan. Following his conviction by a general court-martial, he sought relief in the federal courts through a writ of habeas corpus. *Id.* at 211–12, 69 S.Ct. at 531. The Supreme Court reviewed the then-existing statutes governing military jurisdiction and unanimously concluded that, as a matter of statutory law, discharged servicemembers— "whether reenlisted or not"—were not subject to court-martial jurisdiction for prior-service offenses. *Id.* at 218–19, 69 S.Ct. at 531.

The impact of the *Hirshberg* decision was promptly considered in the contemporaneous hearings before the House Armed Services Committee on the proposed new Uniform Code of Military Justice. *See* Hearings on H.R. 2498 Before a Subcomm. of the House Armed Services Comm., 81st Cong., 1st Sess.

617, 1262 (1949) [hereinafter 1949 House Hearings], *reprinted in Index and Legislative History, Uniform Code of Military Justice* (1950). When the subcommittee charged with drafting the new Code considered and adopted Article 3(a), Subcommittee Chairman Brooks described the language as closing the "loophole" resulting from the *Hirshberg* case. *Id.* at 1262. The subcommittee drafted the provision governing prior-service offenses to provide for court-martial jurisdiction over reservists "for [serious] offenses committed while they were on active duty, even after they had returned to an inactive status," if civilian courts did not have jurisdiction over the case. *Id.* (remarks of Mr. Smart). The House provision was intended to cover not only servicemembers who reenlisted, but also civilians who previously had served but completely severed their connection with the armed forces. *Id.* ("that will get the *Hirschberg* [sic] case where he reenlisted [and] even [if] he had not reenlisted").

The House-passed bill limited jurisdiction over reservists to periods in which they were actually on active duty, Art. 2(1), and periods of voluntary inactive-duty training in which they agreed to be subject to court-martial jurisdiction, Art. 2(3). *See* H.R.Rep. No. 491, 81st Cong., 1st Sess. 82 (1949), *reprinted in Index and Legislative History, supra.* The House-passed bill also provided for jurisdiction over prior service offenses committed by all military personnel, including reservists, subject to the restrictions in Article 3(a)— major offenses not triable in civilian courts— which were applicable to both civilian former servicemembers and current servicemembers. *See id.* at 83.

The Report of the House Armed Services Committee on the proposed legislation described the committee's concern about the "lack of jurisdiction to try certain aggravated cases" involving both a person who had "return[ed] to a civilian status before the discovery of his crime" and a person who had been discharged and then reenlisted after a short break in service. H.R.Rep. No. 491, *supra* at 5. The Committee noted that the proposed Article 3(a) "provides for a continuing jurisdiction provided the offense against this code

is punishable by confinement of 5 years or more and provided further that the offense is not triable in a State or Federal court of the United States." *Id.* The phrase "continuing jurisdiction" reflected the Committee's view that, under Article 3(a), jurisdiction that otherwise would be lost forever by a change in status would be revived if the statutory conditions were met.

The restrictions that limited court-martial jurisdiction to serious offenses not triable in civilian courts reflected the dual concerns of the committee in proposing and adopting Article 3(a)—first, to close the loophole left by *Hirshberg* when there is a break in military service, and second, to exercise caution in view of the proposed use of Article 3(a) for military trials of civilian ex-servicemembers with no continuing military status. The Committee Report stated: "We feel that [Article 3(a)] will provide ample protection against any capricious action on the part of military authorities, will limit military jurisdiction to serious offenses that could not otherwise be tried by military or Federal courts and will likewise correct the absurd situation of permitting an honorable discharge to operate as a bar to a prosecution for murder or other serious offenses." *Id.; see also id.* at 11 (Article 3(a) will "provide a desirable degree of continuing jurisdiction and at the same time place sufficient limitations on the continuing jurisdiction to prevent capricious actions on the part of military authorities"); 95 Cong. Rec. 5720–21 (1949) (remarks of Rep. Vinson), *reprinted in Congressional Floor Debate on The Uniform Code of Military Justice* 7–8 (1949–50) [hereinafter Floor Debate].

In reaction to the strong opposition of the reserve community to the exercise of court-martial jurisdiction over reservists, the House deleted language from the Administration's proposed bill in Article 3(a) that would have permitted an involuntary recall to active duty of a reservist charged with offenses during a prior period of duty. *See* 1949 House Hearings, *supra* at 567; H.R.Rep. No. 491, *supra* at 5. As a result,

the House-passed bill provided no mechanism for recalling a reservist to active duty for disciplinary purposes, a deficiency that was not remedied until enactment of Article 2(d) in 1986. *See* Part II.C.3, *infra.*

In hearings before the Subcommittee of the Senate Armed Services Committee, the Department of Defense witness, Felix Larkin, summarized the relationship between jurisdiction under Article 2 over reservists on inactive duty and application of the proposed Article 3(a) to a reservist after the period of inactive-duty training was completed. Mr. Larkin noted the failure of the House-passed bill to provide authority to recall a reservist to active duty. He observed that if a reservist committed an offense while on inactive duty during a period in which he was under notice that he was subject to the Code—

> thereafter . . . it may or may not be possible to bring him back for trial, depending on the provisions of article 3(a).
>
> Very briefly, you cannot bring him back for trial after this [inactive-duty] training period if his case can be tried in the Federal courts. If it happens to be an offense, however, which is peculiarly military, and which the Federal courts have no jurisdiction over, and which is an offense which calls for more than 5 years' penalty, then you could bring him back thereafter, otherwise you could not.

Hearings on H.R. 4080 Before a Subcomm. of the Senate Armed Services Comm., 81st Cong., 1st Sess. 155 (1949) [hereinafter 1949 Senate Hearings], *reprinted in Index and Legislative History, supra.* Mr. Larkin's comments reflected the fact that the 1950 legislation was drafted long before reservists were considered part of the "total force" for purposes of training, operations, and discipline.

Although opposition to even the limited exercise of jurisdiction under Articles 2(3) and 3(a) of the House-passed version was expressed by several witnesses before the Senate Armed Services Committee,[7] the Sen-

---

7. *See, e.g.,* 1949 Senate Hearings at 156 (testimony of Col. John P. Oliver, Legislative Counsel, Reserve Officers Association of the United States); *id.* at 256–57 (testimony of Maj. Gen. Thomas H. Green, the Judge Advocate General of the Army).

ate Committee retained the House-passed language, noting in its Report:

> Article 3 provides a continuing jurisdiction over certain persons who have left the service and who heretofore have been immune from prosecution. Under this section, however, such persons are subject to this code, whenever the Federal courts do not have jurisdiction, and when the offense is serious enough to call for at least 5 years' sentence and was committed within the statute of limitations.

S.Rep. No. 486, 81st Cong., 1st Sess. 5 (1949), *reprinted in Index and Legislative History, supra.*

Subsequently, Senator Pat McCarran announced his intention to seek referral of the bill to the Judiciary Committee, which he chaired, focusing on jurisdiction over civilians, including the provisions of Article 3 concerning "jurisdiction to try former personnel for offenses committed while subject to the code, if they cannot be tried in the United States courts and if the sentence could be 5 years or more." Letter to Senator Millard E. Tydings, Chairman of the Armed Services Committee, July 1, 1949, *reprinted at* 96 Cong. Rec. 1366 (1950), Floor Debate, *supra* at 228.

Senator Tydings responded as follows:

> Article 3 of the code provides, in general, for a continuing jurisdiction under certain circumstances where jurisdiction has previously attached and was segregated from article 2 for that reason, even though as you pointed out, it generally covers the question of jurisdiction. The problem encountered in connection with this article, and particularly subdivision (a) of it, concerns those types of situations where persons have committed offenses while serving on active duty in the armed services and who, thereafter, by virtue of some artificial situation, are unable to be tried either by courts-martial or the Federal courts. In general, the classes of cases fall into three categories: (1) [r]eservists who go on inactive duty; (2) persons who are discharged from the service; and (3) persons who, although once discharged, reenter the service. A number of cases falling

into these categories have taken place, and it has been found that no jurisdiction resides in any court to bring them to trial. . . .

> \* \* \*

> It was for the purpose of covering cases of this type, over which there is no present jurisdiction, that article 3(a) was drafted. It seems entirely fair that, within the statute of limitations, persons who have committed offenses should not gain an immunity or be excused by virtue of the administrative act of going off active duty or being separated from the armed forces. However, it was not intended to extend blanket jurisdiction over cases of this type, or to convey to military courts jurisdiction under these circumstances over every trivial offense. For that reason, the jurisdiction is limited to serious crimes only by virtue of the provision that the offense must call for a sentence of at least 5 years. In addition, it was felt that where the Federal or State courts have jurisdiction, such jurisdiction should not be disturbed, and there would be no justification in also giving it to the courts-martial. For that reason, it is provided that the courts-martial are to have jurisdiction only if the civil courts do not have it.

Letter to Senator Pat McCarran, July 13, 1949, *reprinted at* 96 Cong. Rec. 1367; Floor Debate, *supra* at 230–32.

The views expressed by Senator Tydings about the limited jurisdiction over offenses committed by reservists on inactive duty reflected Felix Larkin's testimony before the House Subcommittee: In Larkin's view, absent authority to involuntarily recall reservists to active duty for purposes of invoking jurisdiction under Article 2—now provided by Article 2(d)—the only practical basis for exercising court-martial jurisdiction over a reservist for an offense committed during a prior period of inactive-duty training would be under the limited provisions of Article 3, which provided for jurisdiction over major offenses that could not be tried in civilian courts.

When the bill was brought to the Senate floor in February 1950, Senator McCarran

offered a motion to refer the bill to the Judiciary Committee, 96 Cong. Rec. 1412, which was rejected (by vote of 33–43), 96 Cong. Rec. 1417; Floor Debate, *supra* at 255, and no amendments were offered to modify the language of Article 3(a) before the bill was passed.

The initial version of the Manual for Courts–Martial which implemented the new Uniform Code of Military Justice reflected the statutory relationship between Articles 2 and 3. It set forth "[t]he general rule ... that court-martial jurisdiction over" military personnel "and other persons subject to the code ceases on discharge from the service or other termination of such status and that jurisdiction as to an offense committed during a period of service or status thus terminated is not revived by re-entry into the military service or return into such status." Para. 11*a*, Manual for Courts–Martial, United States, 1951. The drafters of the Manual noted that this general rule was "consistent with the Army precedents of over 100 years" and with *Hirshberg. See Legal and Legislative Basis, Manual for Courts–Martial, United States, 1951* at 11 [hereinafter *Legal and Legislative Basis* ] (prepared by the drafters of the 1951 Manual).

The drafters also noted that "[t]o this general rule there are *many exceptions.*" *Id.* (emphasis added). The text of the Manual (¶ 11*b* ) described various exceptions to this general rule under Article 3, including the provisions of Article 3(a) for jurisdiction over serious offenses which "cannot be tried" in the civilian courts. The drafters observed in the *Legal and Legislative Basis, supra* at 12:

> Perhaps the most difficult single jurisdictional fact to be established under Article 3*a* [sic] with respect to offenses committed overseas, is that the offense is not punishable by a civil court. If the offense can be punished by any civil court of the United States, any of its States, Territories, [or the] District of Columbia, a court-martial lacks jurisdiction.

Reflecting the anticipated use of Article 3(a) to prosecute civilian former servicemembers, the drafters stated that "jurisdiction under Article 3*a* [sic] will not be exercised without

the consent of the Secretary of [the] Department" concerned. *Id.* at 11. This is contained in the first subparagraph of ¶ 11*b.*

In addition to the exceptions set forth in Article 3, the Manual provided (¶ 11*b*, subpara. 5) that the general rule concerning termination of jurisdiction upon discharge did not apply when there was a change in status that did not involve a break in amenability to court-martial jurisdiction:

> In those cases when the person's discharge or other separation does not interrupt his status as a person belonging to the general category of persons subject to the code, court-martial jurisdiction does not terminate.

The Manual then provided four examples of circumstances in which a discharge would *not* terminate jurisdiction: first, when an officer in a reserve component serving on active duty was discharged for purposes of accepting a regular commission, jurisdiction would not terminate in view of "there being no interval between the periods of service under the respective commissions"; second, "when an enlisted person" was "discharged ... in order to re-enlist before the expiration of his prior period of service," jurisdiction would continue "provided there is no hiatus between the two enlistments"; third, a member of the armed forces discharged overseas who "immediately becomes" a person in a civilian status subject to the Code "remains amenable to trial by court-martial for offenses committed prior to his discharge because such discharge does not interrupt his status as a person subject to the code"; and fourth, a "dishonorably discharged prisoner" in military custody was subject to trial for offenses committed "while a member of the armed forces and prior to the execution of his dishonorable discharge."

In the *Legal and Legislative Basis, supra* at 12, the drafters emphasized that "uninterrupted status as a person subject to military law in one capacity or another does not terminate jurisdiction." The drafters noted that, in *Hirshberg,* "there was a definite, although brief, hiatus" in his status as a person subject to military law, and they cautioned that the case should not be read as

applying to "cases where there is no hiatus but merely a change in particular status within the general status of being a person subject to military law." *Id.* at 12–13.

The Manual did not expressly address the jurisdictional consequences of continuing military status (*e.g.,* either as a reservist or as a regular who enlists in the Reserves without a break in status) when there had been a break in actual active duty or inactive-duty service (*e.g.,* when the person's performance of military service had been interrupted by one or more breaks between periods of active duty or inactive-duty service) but no hiatus in the person's military affiliation with the armed forces. It is noteworthy, however, that the circumstances described in the Manual did not constitute an exclusive list, but were set forth as examples of situations in which there was no break in service.

### 2. Developments Leading To The 1986 Amendments

In a series of cases that arose during the first decade under the Uniform Code of Military Justice, the Supreme Court held that portions of Articles 2 and 3 were unconstitutional to the extent that they attempted to extend court-martial jurisdiction in peacetime over civilians.[8] These cases included *United States ex rel. Toth v. Quarles,* 350 U.S. 11, 76

S.Ct. 1, 100 L.Ed. 8 (1955), in which the Supreme Court held that Article 3(a) could not be used to subject a former servicemember to trial by court-martial for prior service offenses. Justice Black stated:

> Court-martial jurisdiction sprang from the belief that within the military ranks there is need for a prompt, ready-at-hand means of compelling obedience and order. But Army discipline will not be improved by court-martialing rather than trying by jury some *civilian ex-soldier who has been wholly separated from the service* for months, years or perhaps decades. Consequently considerations of discipline provide no excuse for new expansion of court-martial jurisdiction at the expense of the normal and constitutionally preferable system of trial by jury.

*Id.* at 22–23, 76 S.Ct. at 8 (emphasis added). In reaching its decision, the Court relied on broad constitutional principles and did not consider the specific language of Article 3(a) or application of the statute to persons not "wholly separated" from the armed forces.

Over the next three decades, this Court considered the relationship between Articles 2 and 3 in light of *Toth* in a variety of circumstances, culminating in our consideration in *United States v. Caputo,* 18 MJ 259 (1984).[9] In *Caputo,* our Court addressed the

---

8. See 48 MJ at 157 n. 4, and cases cited therein.

9. As a result of shifting majorities and approaches, cases were decided, distinguished, overruled, and revived, creating substantial uncertainty as to the relationship between Articles 2 and 3. *See, e.g., United States v. Gallagher,* 7 USCMA 506, 510–11, 513–14, 22 CMR 296, 300–01, 303–04 (1957) (*Toth* does not preclude the exercise of Article 3(a) jurisdiction over a servicemember for offenses committed during a prior enlistment, even assuming a short break in service between the first and second enlistments); *United States v. Martin,* 10 USCMA 636, 28 CMR 202 (1959) (1–1–1 decision) (sustaining jurisdiction over offenses committed during a prior period of enlistment without applying the restrictions in Article 3(a), where the accused was discharged from an "indefinite" enlistment and immediately reenlisted for a definite period); *United States v. Wheeler,* 10 USCMA 646, 28 CMR 212 (1959) (upholding jurisdiction under Article 3(a) over reservist who voluntarily consented to recall to active-duty status for purposes of court-

martial for an offense committed during a prior period of service in the Regular Air Force, but finding that accused's inactive reserve status after his separation from active service did not render him subject to court-martial jurisdiction under Article 2(3)); *accord Wheeler v. Reynolds,* 164 F.Supp. 951, 952–54 (N.D.Fla.1958); *United States v. Brown,* 12 USCMA 693, 695, 31 CMR 279, 281 (1962) (2–1 decision) (no court-martial jurisdiction over servicemember who had received valid orders "terminating [his] active duty in the Regular Navy and transferring him to inactive duty in the Naval Reserve"; for purposes of Article 2, orders terminating active-duty status and transferring accused to a reserve component were effective upon delivery, precluding court-martial jurisdiction "just as if his entire service obligation had been completed by delivery of a valid discharge"); *United States v. Noble,* 13 USCMA 413, 32 CMR 413 (1962) (2–1 decision) (sustaining jurisdiction over prior-service offenses without applying the restrictions in Article 3(a), where servicemember, while serving on an extended enlistment, was discharged and then reenlisted for a definite 6–year period); *United*

issue of military jurisdiction over a reservist charged, while on inactive duty for training, with offenses committed during a prior period of active duty for training, *id.* at 260, when there had been a temporal rather than a status break in the reservist's amenability to court-martial jurisdiction during the time between the offense and the time of trial, *id.* at 261.

Caputo was charged with committing various offenses during a 2–week tour of active duty for training, which could have been tried in the state courts. Although a number of these offenses came to the attention of military authorities during his 2–week period of active duty, no action was taken at that time with a view towards a trial by court-martial. Caputo was allowed to complete his period of active duty and return to civilian life. *Id.* at 261. At that point, although he remained a member of the Reserves, he was not subject to court-martial jurisdiction under Article 2.

Subsequently, charges were prepared and sworn to by reserve authorities. When Caputo reported to his reserve unit for a period of inactive-duty training, he was advised of the charges against him and was placed temporarily in pretrial confinement, his period of inactive-duty training was extended for an indefinite period, and a special court-martial was convened. Caputo moved to dismiss the case for lack of personal jurisdiction. After this motion was twice denied, Caputo sought extraordinary relief from this Court. *Id.* at 261–62, 260.

Chief Judge Everett, in an opinion joined by Judge Fletcher, expressly declined to reach any of the statutory issues in the case and resolved it based upon language in Manual for Courts–Martial, United States, 1969 (Revised edition), which was then in effect. 18 MJ at 266–67. Chief Judge Everett noted that Caputo was on active duty at the time he committed the offenses, which established jurisdiction over the offenses under Article 2(a)(1). *Id.* at 263, 268–69 n. 9. He also noted that, as a matter of constitutional law, Article 2(a)(3)—covering reservists "while they are on inactive duty training authorized by written orders which are voluntarily accepted by them and which specify that they are subject to this chapter"—provided a statutory basis for establishing personal jurisdiction during a period of inactive-duty training. He observed:

> We perceive no constitutional problem with Article 2(a)(3).... Contrary to Caputo's position, a reservist is not in every respect a civilian. Instead, by joining the Reserve Forces, he assumes special obligations—such as to train himself and to be prepared for extended active duty.

*Id.* at 265. With regard to the constitutional power of Congress to authorize jurisdiction over reservists, Chief Judge Everett noted the increased reliance of the armed forces on reservists as part of the "total force" and cited the use of training assignments for reservists "integrated more closely with the assignments of active-duty personnel," the regular use of reservists in functions such as transport to render "valuable service to the armed forces," and the "continued vitality of the tradition of the citizen-soldier." *Id.* at 265–66.

States v. Steidley, 14 USCMA 108, 33 CMR 320 (1963) (2–1 decision) (applying Article 3(a) criteria to preclude jurisdiction where the accused was discharged and reenlisted the next day; no court-martial jurisdiction because the charged offenses were not punishable by confinement for 5 years or more, or they were triable in federal district court as civilian offenses); *United States v. Schuering,* 16 USCMA 324, 36 CMR 480 (1966) (upholding jurisdiction over offenses committed during a prior period of reserve inactive duty for training on the grounds that Article 3(a) did not apply when the breaks in service only involved different periods of inactive duty for training, but finding no jurisdiction because of the absence of statutory authority to order the accused to active duty for disciplinary purposes); *United States v. Ginyard,* 16 USCMA 512, 37 CMR 132 (1967) (2–1 decision) (applying Article 3(a) criteria to preclude jurisdiction when accused was discharged for purposes of immediate reenlistment); *United States v. Clardy,* 13 MJ 308 (CMA 1982) (2–1 decision) (overruling *Ginyard* and restoring the pre-*Ginyard* doctrine that military jurisdiction is never lost—and the restrictions in Article 3(a) do not apply—if a servicemember is discharged solely for the purpose of reenlistment and the person's military status is uninterrupted).

The *Caputo* opinion specifically rejected the assertion that Article 2(a)(3) should be interpreted narrowly to implement comments in its legislative history, which suggested that such jurisdiction should be exercised only over those involved in the use of expensive or dangerous equipment:

> [E]ven if the Navy were seeking to invoke Article 2(a)(3) for purposes and under circumstances not contemplated during the 1949 hearings on the Code, we doubt that Congress intended for this Court—or an Article III Court—to decide whether various military duties performed by inactive reservists for training were among those mentioned in the hearings.

*Id.* at 265. The opinion added that significant prudential considerations cautioned against using the legislative history to expand the express limitations in the statute in a manner that would unnecessarily interject the courts into military assignment policies: "[T]hat type of inquiry would lead us into the sort of thicket which courts have traditionally sought to avoid." *Id.*, citing *Chappell v. Wallace,* 462 U.S. 296, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983), and *Orloff v. Willoughby,* 345 U.S. 83, 73 S.Ct. 534, 97 L.Ed. 842 (1953). The opinion concluded that, "if Caputo's situation falls within the letter of [Article 2(a)(3) ], we shall not seek to determine whether it conforms to the spirit of this legislation." 18 MJ at 265.

The Court noted that the wording of the specific orders issued to Caputo raised questions about his amenability to court-martial jurisdiction during the period of inactive-duty training in which the trial took place, *id.* at 266, but decided it was unnecessary to explore the effect of the orders in view of paragraph 11a, 1969 Manual, *supra,* which provided:

> The general rule is that court-martial jurisdiction over commissioned officers, cadets, midshipmen, warrant officers, enlisted members and other persons subject to the code ceases on discharge from the service or other termination of that status and that jurisdiction as to an offense committed during a period of service or status thus terminated is not revived by re-entry

into the military service or return to such a status.

The Court further noted that, although Caputo committed the offense while on active duty, his status as a person subject to the Code terminated when he returned to civilian life upon the expiration of his active-duty orders. 18 MJ at 266–67. His subsequent return to a status as a person subject to the Code as a reservist on inactive-duty training was insufficient, under the provisions of paragraph 11a, to revive jurisdiction unless his circumstances fell within one of the "exceptions" to the "general rule" set forth in paragraph 11b. *Id.* at 266. Since none of those exceptions were applicable, the opinion concluded that the "general rule" in paragraph 11a precluded court-martial jurisdiction over Caputo. *Id.* at 267.

As an aside, the opinion observed that there might be some unspecified "practical problems" in trying a reservist on "extended" inactive duty, even if the conditions of Article 3(a) were present, and it commented that "Congress may wish to consider whether express authority should be granted ... to order a reservist to active duty for the purposes of court-martial with respect to an offense that has occurred during an earlier period of military service and which falls within the purview of Article 3(a)." *Id.* at 267–68; *see also id.* at 268 n. 8 (citing the concession of counsel for the Government "that there is no authority to order Caputo to active duty for purposes of a trial by court-martial").

Judge Cook, "dubitante," expressed doubt as to whether the "termination of that status" language from paragraph 11a, 1969 Manual, *supra,* relied upon by the majority, applied to the end of a period of either active duty or inactive-duty training by a reservist. 18 MJ at 274. In view of the significant changes in the role of the reserves since enactment of the UCMJ in 1950, he "strongly urge[d] Congress to clarify its intentions in this highly significant area of military law." *Id.* at 275.

A subsequent case decided at the intermediate level, *United States v. Poole,* 20 MJ 598 (NMCMR 1985), applied the principles of

*Caputo* to offenses committed prior to a discharge from regular active service when there was subsequent reserve service. Poole served on active duty with the Regular Marine Corps. While still on active duty, he joined the Reserves. A day later, he was released from active duty with an honorable discharge at the end of his period of regular service. Three months later, as a reservist, he entered into a period of active duty for training. During this period, he was placed in administrative disciplinary status, tried, and convicted for offenses that occurred during his prior period of Regular Marine Corps service. The Navy–Marine Corps Court of Military Review, citing *Caputo*, held that Poole's return to civilian life after his regular service brought him under the "general rule" in paragraph 11*a*, 1969 Manual, *supra*, which precluded jurisdiction because none of the exceptions in paragraph 11*b* were applicable. 20 MJ at 599.

Our Court again relied on this same paragraph 11*a* in *Duncan v. Usher*, 23 MJ 29 (1986). Duncan, a reservist, served a period of extended active duty. He was released from that active duty and subsequently voluntarily entered onto another period of extended active duty. During this second period, Duncan was tried by court-martial and convicted of offenses occurring during his earlier period of extended active duty. *Id.* at 29–30.

Shortly after Duncan's trial, this Court's decision in *Caputo* was issued, and Duncan sought to dismiss the case for lack of jurisdiction through a petition for extraordinary relief to the Court of Military Review. Chief Judge Everett's opinion of this Court on the writ-appeal concluded that, as a result of the break in service, the case was governed by the "general rule" in paragraph 11*a*, 1969 Manual, *supra*, which precluded the exercise of court-martial jurisdiction under *Caputo*. 23 MJ at 35–36.[10] Noting the importance of

reservists to the total-force policy, however, he added:

> Because of the importance of reservists to our national security, the President and Congress may decide that the jurisdictional rules which now apply are outmoded. Indeed, we are aware that the Department of Defense has considered this question at some length and has proposed to Congress legislation that will change the jurisdictional rule which must be applied in this case. This proposal is now being considered by both Houses of Congress.

23 MJ at 35.

### 3. Legislative Development And Implementation Of The 1986 Amendments To Articles 2 And 3

Subsequent to *Caputo*, *Poole*, and *Duncan*, the state of the law was as follows: First, paragraph 11*a*, 1969 Manual, *supra*, set forth a "general rule" precluding exercise of court-martial jurisdiction during a period of active duty or inactive-duty training for an offense committed during an earlier period of regular or reserve service, absent an exception to this "general rule"; second, the issue of whether the applicable statutes required such an interpretation was left open; third, there was no statutory authority to order a reservist to active duty for disciplinary purposes; and fourth, Congress was vested with constitutional authority to provide for jurisdiction over offenses committed during a prior period of service and to provide for a reservist to be ordered to active duty solely for disciplinary purposes.

The President addressed the first matter—the restrictions imposed by the provisions of paragraph 11*a* concerning termination of jurisdiction—through issuance of Executive Order No. 12473, 49 Fed.Reg. 17152 (April 13, 1984), which deleted from the Manual for Courts–Martial all of the

**10.** Judge Sullivan concurred and noted the absence of a statute conferring jurisdiction over a reservist for a prior-service offense after a break in active-duty status if the conditions in Article 3(a) could not be met. 23 MJ at 40–41. He added that legislative "reconsideration" of the statutes governing jurisdiction over reservists "is long overdue." *Id.* at 41. Then–Judge Cox dissented on the grounds that jurisdiction existed under Article 2(a)(1) because Duncan was subject to military jurisdiction at both the time of the offense and the time of trial, and Article 3(a) was inapplicable to breaks in active-duty status when there was no termination of reserve status. *Id.* at 41–42.

language concerning termination of jurisdiction, including consideration of the effects of a discharge or other changes in status. *See* RCM 201–203, Manual for Courts–Martial, United States, 1984.[11] These matters were addressed in the non-binding "Discussion" sections, which are not part of the Manual and which do not contain official rules or policy. *See* Part I, § 4, Discussion. The Discussion sections attempted to distill some general principles from the then-existing case law and to use a non-binding format that would not preclude the courts from adopting different interpretations of the law. *Id.*

With respect to the balance of the issues raised in *Caputo*, legislative action appeared to be necessary. In the aftermath of *Caputo*, *Poole*, and *Duncan*, Congress enacted legislation that, in three separate steps, revised the laws governing court-martial jurisdiction over reservists. *See* National Defense Authorization Act for Fiscal Year 1987, Pub.L. No. 99–661, § 804, 100 Stat. 3906–07 (1986).

First, the amendments eliminated the language in subsection (a)(3) of Article 2 that had precluded jurisdiction over persons on inactive-duty training absent "written orders which are voluntarily accepted by them and which specify that they are subject to this chapter." They also revised Article 2 to provide for comprehensive jurisdiction over reservists on federal inactive-duty training as follows:

> (a) The following persons are subject to this chapter:
>
> \*　　\*　　\*
>
> (3) Members of a reserve component while on inactive-duty training, but in the case of members of the Army National Guard of the United States or the Air

National Guard of the United States only when in Federal service.

100 Stat. 3906.

Second, the 1986 amendments addressed the problem identified in *Caputo* concerning the lack of authority to "order[ ] a reservist to active duty when a primary purpose of the active duty would be to allow his court-martial for prior violations of the Uniform Code." 18 MJ at 268 n. 8 (citing *United States v. Schuering*, 16 USCMA 324, 36 CMR 480 (1966), and *United States v. Wheeler*, 10 USCMA 646, 28 CMR 212 (1959)). The amendments established subsection (d) of Article 2, which provides broad authority to involuntarily activate "[a] member of a reserve component who is not on active duty" for purposes of nonjudicial punishment proceedings under Article 15, UCMJ, 10 USC § 815, or disposition of court-martial charges concerning offenses committed while the member was "on active duty" or "on inactive-duty training." *See* Art. 2(d)(1) and (2).[12]

The third element of the 1986 legislation was to make clear that termination of a period of reserve service did not constitute the type of break in service that would preclude court-martial jurisdiction. The amendments established subsection (d) under Article 3, which provides:

> (d) A member of a reserve component who is subject to this chapter is not, by virtue of the termination of a period of active duty or inactive-duty training, relieved from amenability to the jurisdiction of this chapter for an offense against this chapter committed during such period of active duty or inactive-duty training.

100 Stat. 3907. As a result, termination of a period of amenability to the UCMJ would not preclude exercise of court-martial jurisdiction over a prior service offense during a subsequent period of service.

---

11. This change, part of a comprehensive revision of the Manual for Courts–Martial, pre-dated our decision in *Caputo* but did not become effective until August 1, 1984, after that case was decided. The change eliminated all non-statutory limitations on jurisdiction over the person. *See* RCM 202(a).

12. The statute also required that the order be issued "under regulations prescribed by the President" and by "a person empowered to convene general courts-martial," and that approval of the activation by the Service Secretary was required as a predicate to imposition of a punishment involving confinement or certain other restrictions on liberty. Art. 2(d)(3)-(5).

The purpose of these three provisions was not to simply address the specific facts of the *Caputo* case, but also to undertake a comprehensive revision of the statutes governing court-martial jurisdiction over reservists. The House Armed Services Committee, which initiated the amendments, stated in its report on the legislation that the provision "would conform the UCMJ to the total-force policy by subjecting members of the reserve components in Federal status to the *same disciplinary standards as their regular component counterparts.*" H.R.Rep. No. 718, 99th Cong., 2d Sess. 225 (1986) (emphasis added). The Report noted that, when the UCMJ initially was enacted, the reserve components were "viewed as a separate force," but this was no longer the case since reserve training had become "closely integrated with the missions of active-component units," so "reservists provide valuable services to the armed forces," and "[r]eserve units routinely participate with regular units in realistc [sic] arms training and field exercises at home and abroad" and "directly augment actual active-component missions." *Id.* at 226.

After noting Senior Judge Cook's "dubitante" comment in *Caputo* that "Congress in 1950 'never considered the present amalgamation of the reserve forces into the total-force concept of today,' " the Committee observed that "the military disciplinary system is encumbered with impediments to the appropriate exercise of jurisdiction over reservists." H.R.Rep. No. 718, *supra* at 226. The Committee reiterated that the proposed amendments were designed to "reflect the reality of the total force concept by subjecting members of the Reserve Components in Federal status to the same disciplinary standards as their regular-component counterparts." *Id.*

After describing the amendments in detail, the Committee referred to the *Caputo* case in language which clearly indicated that addressing the circumstances in *Caputo* was only one of the purposes of the legislation: "The amendments would, *further*, bridge the jurisdictional gap identified in *United States v. Caputo.*" *Id.* at 227 (emphasis added) (describing *Caputo* as holding that "jurisdiction over offenses committed by a reservist during a period of duty was permanently lost in the absence of some affirmative action to preserve jurisdiction taken during that period of duty").

The primary effect of the 1986 legislation was that a reservist would no longer be relieved of amenability to court-martial jurisdiction for offenses committed on active duty or during inactive-duty training by virtue of a return to civilian life at the end of a period of such duty. In other words, even though a return to civilian life would mean that a reservist could not be tried by court-martial for offenses committed while a civilian, that break in the status of being subject to military law would not constitute a break in service so long as the person continued his or her military status as a member of the reserve components. The new legislation also provided express authority to involuntarily activate such a reservist for the sole purpose of conducting disciplinary proceedings with respect to offenses committed during a prior period of service.

The President implemented these amendments effective March 12, 1987, by promulgating RCM 204, entitled "Jurisdiction over reserve component personnel," which remains in effect. In addition to implementing Articles 2(d) and 3(d), RCM 204 includes subsection (d), *"Changes in type of service,"* which provides:

A member of a reserve component at the time disciplinary action is initiated, who is alleged to have committed an offense while on active duty or inactive-duty training, is subject to court-martial jurisdiction *without regard to any change between active and reserve service or within different categories of reserve service* subsequent to commission of the offense. This subsection does not apply to a person whose military status was completely terminated after commission of an offense.

Exec. Order No. 12586, § 1b, 52 Fed.Reg. 7104 (emphasis added). This Rule, like the statute, does not distinguish between past regular or past reserve service. *See also* RCM 204(d), Discussion. However, consistent with both *Toth* and *Hirshberg,* the Rule

notes that subsection (d), insofar as it provides that a change in status within categories of military service did not terminate jurisdiction, would "not apply to a person whose military status was completely terminated after commission of an offense." RCM 204(d). The Discussion accompanying that Rule notes—

A "complete termination" of military status refers to a discharge relieving the servicemember of any further military service. It does not include a discharge conditioned upon acceptance of further military service.

The Drafter's Analysis of the Rule, 1984 Manual, *supra* at A21–13, states that subsection (d) "reflects legislative intent 'not to disturb the jurisprudence of *United States ex rel. Hirshberg v. Cooke*, 336 U.S. 210, 69 S.Ct. 530, 93 L.Ed. 621 (1949)' (H.R.Rep. No. 718, 99th Cong., 2d Sess. at 227 (1986))."

In view of these developments, the state of the law with respect to reservists following the 1986 amendments to Articles 2 and 3 was as follows: If there was a complete termination of military status with no subsequent military service, then the former servicemember would not be subject to court-martial jurisdiction for prior-service offenses as a matter of constitutional law under *Toth*. If, however, there was a complete termination of military status followed by reentry into reserve service, then the reservist would be subject to court-martial jurisdiction for prior-service offenses, subject to the major offense and nontriability conditions of Article 3(a). Finally, if there was a change in status between regular and reserve service, or within various forms of reserve service, unaccompanied by a complete termination of military status, then the reservist would be subject to court-martial jurisdiction for all prior-service offenses to the same extent as a regular whose military status had changed in form without a complete termination of military status.

D. *The Effect On The Present Case Of Legislation Subjecting Reservists To The Same Disciplinary Standards As Their Regular Component Counterparts*

In ruling on appellant's motion to dismiss for lack of jurisdiction, the military judge entered findings of fact and conclusions of law which focused on appellant's military status as a member of the Regular Army at the time of the alleged offenses and his military status as a member of the Army Reserve at the time he received the active-duty orders related to the present proceedings. The military judge did not specifically address the issue of whether appellant's military status was "completely terminated" for purposes of RCM 204(d) after the dates on which the offenses allegedly were committed, although some of his findings and conclusions bear on this issue.

In reaching his decision, the military judge stated: "In this case, [appellant] has maintained a constant and active affiliation with the United States Army since his original enlistment began on 13 January 1982." This conclusion is supported by the factual findings that, while on active duty, appellant requested an early discharge for purposes of accepting civilian employment and signed a contract for enlistment in the Army Reserve for the 1–year period following his separation from active duty.

On the other hand, the military judge described appellant's discharge from the Regular Army and his enlistment in the Reserves in terms that would not necessarily preclude a determination that there was a complete termination of military status followed by a subsequent enlistment. *Cf. United States v. King*, 27 MJ 327 (CMA 1989); *United States v. Clardy*, 13 MJ 308 (CMA 1982). The judge, for example, noted that appellant "was honorably discharged from the Regular Army" on March 31, 1992, and that "[t]he next day, 1 April 1992, he began his enlistment in the Army Reserve." The military judge also stated, "His change in status from the Regular Army to the reserve component occurred the day following his discharge from active duty." These comments leave open the possibility that there was no direct relationship between the discharge and the reserve enlistment and that there was a complete termination on March 31, 1992, followed by a new period of service on April 1, 1992.

Each party in the present case, for separate reasons, contends that there was no need for the military judge to definitively rule on whether there was a break in appellant's military service.

The Government takes the position that Article 2(d) provides an unqualified grant of jurisdiction that subjects reservists to court-martial jurisdiction for all offenses committed during a prior period of service, regardless whether there was a break that completely terminated the person's military service. Under this view, enactment of Article 2(d) rendered Article 3(a) inapplicable to reservists. Under the Government's theory, there was no need for the court to consider whether there had been a complete termination of service and, if so, whether the crime involved an offense punishable by 5 years' confinement that could not be tried in U.S. civilian courts.

Appellant, on the other hand, contends that Article 2(d) grants court-martial jurisdiction over reservists only as to offenses committed while on active duty in a reserve component. If appellant is correct, Article 2(d) could be used to activate a person whose prior service offenses were committed while in a reserve component, but it could not be used to activate a person, such as appellant, whose alleged offenses were committed while in a regular component.

We reject both of these positions as inconsistent with the applicable statutes.

### 1. Article 2(d) Does Not Exclude Reservists From the Coverage of Article 3(a)

■ According to the Government, it was unnecessary for the military judge to determine whether there was a complete termination of appellant's military status, so long as there was court-martial jurisdiction over appellant at the time of the offense and at the time of trial. The Government suggests that our opinion in *Murphy v. Garrett*, 29 MJ 469 (1990), stands for the proposition that the text of Article 2(d)—which authorizes activation of reservists for disciplinary purposes— provides an unqualified grant of jurisdiction over reservists with respect to both current

and prior-service offenses. Under the Government's reading of that opinion, even when there has been a complete termination of an accused's military status followed by a separate unrelated period of service, the restrictions in Article 3(a) do not apply, so the Government need not demonstrate that the case involves a major offense not triable in civilian courts.

The Government reads too much into *Murphy v. Garrett*. In that case, we denied a request for extraordinary relief that would have enjoined the Marine Corps from ordering a reservist to "active duty to participate in" an investigation under Article 32, UCMJ, 10 USC § 832, and possibly to stand trial by court-martial. 29 MJ at 470. Our opinion addressed the authority to order a reservist to active duty under Article 2(d). We did not find it necessary at the preliminary stage of the proceedings, however, to address the implications of Article 3(a), and our interlocutory ruling did not consider whether there had been a complete termination of the accused's service. *Id.* at 471. Accordingly, we do not regard *Murphy v. Garrett* as establishing a definitive precedent on the relationship between Articles 2(d) and 3(a).

The Government's theory is based upon the premise that Article 2(d) provides an independent grant of jurisdiction and that there is no relationship between Articles 2(d) and 3(a). The necessary implication of this theory is that the limitations in Article 3(a)— providing for court-martial jurisdiction only over serious offenses that cannot be tried in U.S. civilian courts—apply only to members of the regular components.

The Government's view would produce an anomalous distinction between reservists and regulars. For example, if a reservist had two periods of reserve service separated by a complete termination of military status, he could be called to active duty under Article 2(d) for any offense committed during the earlier period of service, no matter how minor, without regard to the limitations in the applicable version of Article 3(a). The Government, however, does not suggest that Article 2(d) somehow rendered Article 3(a) inapplicable to members of the regular com-

ponents. Therefore, a regular component servicemember who committed an offense during a prior period of active duty and subsequently had a complete termination of military service could not be tried by court-martial during a later enlistment, unless the offense met the then-applicable Article 3(a) criteria (*i.e.*, it was a major offense not triable in the U.S. civilian courts).

The Government's reading of the statutes would provide for a degree of court-martial jurisdiction over reservists far more extensive than that provided over regulars. Nothing in the wording of Article 3(a) suggests that its restrictions apply only to regulars and not to reservists, and nothing in the legislative history of the 1986 amendments suggests that Congress intended to provide for a more extensive degree of court-martial jurisdiction over reservists than over regulars. On the contrary, the legislative history emphasizes that the intent of the legislation was to subject reservists "to the same disciplinary standards as their regular component counterparts." *See* 48 MJ at 169. In this regard, we also note that interpreting the statutes in a manner that would subject Reserves to a greater amenability to court-martial jurisdiction than Regulars—absent a clear indication that Congress intended to do so—would be inconsistent with the general congressional policy that the "[l]aws applying to both Regulars and Reserves shall be administered without discrimination...." 10 USC § 10209.

## 2. Articles 2(d) and 3(d) Do Not Shield Reservists From Accountability For Misconduct Committed During Prior Regular–Component Service

 Appellant, taking a different perspective, suggests that Article 2(d) cannot be used to support jurisdiction in this case, even if the conditions of Article 3(a) are met. According to appellant, the phrase "active duty" in Article 2(d)(2) applies only to offenses that occurred while the individual was on active duty as a member of a reserve component, so Article 2(d) does not provide authority to order a reservist to active duty to stand trial for offenses committed while he was on active duty as a member of a regular component.

We do not agree with appellant's reading of the statute. Article 2(d)(2), which provides the authority to order reservists to active duty, states:

> A member of a reserve component may not be ordered to active duty ... [for purposes of investigation, trial by court-martial, or non-judicial punishment] except with respect to an offense committed while the member was—
>
> (A) on active duty; or
>
> (B) on inactive duty training[.]

Although Article 2(d)(2) limits jurisdiction to offenses committed while the reservist was "on active duty" or "on inactive-duty training," it does not distinguish between regular or reserve status with respect to the prior period of "active duty" service during which the offense allegedly was committed.

Appellant cites *Murphy v. Dalton*, 81 F.3d 343 (1996), for the proposition that the term "active duty" in Article 2(d) covers only prior Reserve Component service. In *Murphy v. Dalton*, a divided panel of the Third Circuit concluded that Article 2(d)—which provides the authority to order a reservist to active duty—is subject to the limitations on jurisdiction over prior-service offenses in Article 3(a). *Id.* at 349–50. That holding is consistent with our views in the present case.[13]

---

13. *Murphy v. Dalton*, 81 F.3d 343 (1996), involved the same court-martial as *Murphy v. Garrett*, 29 MJ 469 (CMA 1990), *see* 48 MJ at 171. Following our interlocutory ruling, Murphy was tried and convicted. After exhausting his remedies on direct review, he mounted a collateral attack on his conviction in Federal district court. Although the district court granted summary judgment for the Government, the Third Circuit vacated that order. Based upon matters filed at trial, as well as post-trial filings that were not

available to us in *Garrett*, the Third Circuit concluded that there had been a complete termination of service between Murphy's regular and reserve service, making the case subject to the limitations of Article 3(a). 81 F.3d at 347–49. To the extent that *Dalton* is based upon a determination that there was a complete break in service, we do not disagree with the approach of the Third Circuit. To the extent that *Dalton* suggests other limits on the authority to activate reservists for disciplinary purposes under Article 2(d), we disagree for the reasons set forth herein.

The opinion in *Murphy v. Dalton*, however, also asserted that a reservist was not subject to court-martial jurisdiction, absent the conditions in Article 3(a), if there had been any break in the reservist's status as a person subject to the Code (*e.g.*, when there were intermittent periods of active duty and inactive-duty training), even if there had been no interruption in the person's military affiliation. The primary basis for this view was the Third Circuit's assertion that the term "active duty" in Article 2(d) refers only "to those periods of active duty served by a reservist while performing such duty in the reserves." 81 F.3d at 352. This interpretation would preclude activation of a reservist for an offense that occurred during active duty performed as a member of a regular component.

No such limitation appears in Article 2(d). Moreover, such a limitation would be inconsistent with the statutory definition of "active duty," 10 USC § 101(d)(1) (1992), which applies throughout title 10 of the United States Code—the main body of codified law applicable to the "Armed Forces"—including the Uniform Code of Military Justice, 10 USC §§ 801–946. The broadly-worded definition in § 101(d)(1) states [14]:

> The term "active duty" means full-time duty in the active military service of the United States. Such term includes full-time training duty, annual training duty, and attendance, while in the active military service, at a school designated as a service school by law or by the Secretary of the military department concerned. Such term does not include full-time National Guard duty.

There is no exclusion in § 101(d) for regular component service. The only exclusion is for "full-time National Guard duty"—a term which applies only to duty performed "in the member's status as a member of the National Guard of a State," 10 USC § 101(d)(5), and which does not otherwise exclude any regular or reserve component duty.[15] It is also noteworthy that, with respect to other definitions concerning duty status, Congress has expressly referenced the reserve components when it sought to confine application of a definition to the Reserves. *See, e.g.*, 10 USC § 101(d)(4) (1996) (definition of "active status" applicable to "a member of a reserve component"); § 101(d)(7) (definition of "inactive-duty training" applicable to specified duties in the "Reserves").

*Dalton* did not cite any statement in the legislative history which would require that the term "active duty" be used in an unusual or restricted sense, or any sentiment that the term should exclude prior regular component service. The opinion (81 F.3d at 351) relied upon a comment in the Report expressing the general desire of the House Armed Services Committee to close "the jurisdictional gap identified" by our opinion in *United States v. Caputo*, 18 MJ 259, *see* H.R.Rep. No. 718, *supra* at 227,[16] a comment that did not concern the definition of "active duty."

As noted in Part II.C.2., *supra*, the *Caputo* decision was based solely on paragraph 11d, 1969 Manual, *supra*—a regulatory provision rescinded prior to the dates of the alleged offenses in the present case. The general reference to *Caputo* in the legislative history does not justify ignoring the plain meaning of the statutory definition of "active duty." On the contrary, congressional use of the term "active duty"—a term frequently used to cover both regular and reserve component ser-

14. *The definition in effect at the time the offenses allegedly were committed, which was codified at 10 USC § 101(22), was identical, except that the word "It" was used in lieu of "Such term" each time that phrase appeared.*

15. *The definition in effect at the time the offenses allegedly were committed, which was codified at 10 USC § 101(42), was identical.*

16. It is possible that a mistaken omission of a comma in its quotation of the legislative history

led the *Murphy v. Dalton* court to believe that the sole purpose of the legislation was to address *Caputo*. The *Dalton* opinion quotes the House Report, at 227, as follows: "The amendments would further, [sic] bridge the jurisdictional gap identified in *United States v. Caputo* ...." The actual text of the report, however, makes clear that addressing *Caputo* was only one aspect of the legislation: "The amendments would, further, bridge the jurisdictional gap identified in *United States v. Caputo* ...." *See* Part II.C.3, *supra*.

vice—would indicate a desire to cover offenses committed in either component.

■ The opinion in *Murphy v. Dalton* suggests that Article 2(d) should not apply to offenses committed by a reservist during a prior period of regular service, in view of Article 3(d). 81 F.3d at 351. The opinion, however, reads too much into Article 3(d), which had as its limited purpose making clear that termination of a period of reserve service on active duty or inactive-duty training would not constitute the type of break-in-service that would preclude court-martial jurisdiction. *See* Part II.C.3, *supra.*

The opinion in *Murphy v. Dalton* also relied on negative legislative history as the basis for ignoring the plain meaning of "active duty," asserting that "[n]owhere is there evidence of a congressional intent to subject a reservist to court-martial jurisdiction for offenses committed on active duty while in the regular component." 81 F.3d at 351–52. We do not agree with the suggestion that Congress is precluded from using a broad statutory term such as "active duty" unless it provides in the legislative history a detailed discussion of all the different situations intended to be covered by the term. While use of legislative history can provide an important tool in interpreting ambiguous statutes, and while there may be special circumstances in which the absence of legislative history may be telling, we are not persuaded that the plain meaning of "active duty" should be circumscribed on the basis of matters that the legislative history does not address.

The opinion in *Murphy v. Dalton* concluded by stating that the term "active duty" in Article 2(d) did not include active duty in the regular components because "the congressional history shows that Congress did not intend to change the result in *Hirshberg*," 81 F.3d at 352, citing the following excerpt from the House Report at 227:

> With respect to the proposed amendment of Article 3, the committee intends not to disturb the jurisprudence of *United States ex rel. Hirshberg v. Cooke*, 336 U.S. 210, 69 S.Ct. 530, 93 L.Ed. 621 (1949).

The quoted material, however, does not stand for the proposition that the committee sought to preserve "the result" in *Hirshberg*. As noted in Part II.C.1., *supra,* Congress in fact did "change the result" in *Hirshberg* in 1950 (48 MJ at 160–61)—nearly a half-century ago and less than 2 years after *Hirshberg* was decided by the Supreme Court—through enactment of Article 3(a). What the committee sought to preserve was the framework of the *Hirshberg* analysis: that a discharge creates an absolute bar to court-martial jurisdiction only in the absence of a statute providing for jurisdiction after a break in service. At most, the reference to *Hirshberg* in the legislative history to the 1986 amendments cited above indicates an intent that the amendments be interpreted in a manner consistent with the premise of *Hirshberg*, which would mean that anyone ordered to active duty could be tried only for prior service offenses to the extent permitted under the statutes providing for jurisdiction after a break in service, *see, e.g.,* Arts. 2(d), 3(a), and 3(d).

The primary flaw in *Murphy v. Dalton* is that it fails to address the consequences of treating prior-service offenses in the Reserves differently from prior-service offenses in the regular components. Interpretation of the phrase "active duty" in Article 2(d) to apply only to prior active duty in a reserve component (and thereby exclude prior active duty in a regular component) would produce the following anomalous result with respect to offenses that would otherwise be subject to trial by court-martial under Article 3(a): A member of a reserve component could be ordered to active duty to stand trial for any offense committed while on active duty during a prior enlistment in a reserve component, no matter how trivial; but a similarly situated member could not be called to active duty for an offense committed during a prior enlistment in a regular component. In other words, a reservist who raped the spouse of a fellow servicemember during a prior enlistment could be activated for trial by court-martial if the prior enlistment was with the Reserves, but the reservist could not be activated if the prior service had been as a Regular.

We do not find, in either the express words of the applicable statutes, the purposes of the

legislation, or the legislative history of Article 2(d), an intent to create a haven from accountability for those reservists whose prior service was in a regular rather than a reserve component. Such an arbitrary distinction would be inconsistent with one of the main purposes of the 1986 legislation, which was to "subject[ ] members of the reserve components in Federal status to the same disciplinary standards as their regular-component counterparts." H.R.Rep. No. 718, *supra* at 225.[17] Moreover, such an interpretation would be inconsistent with the statutory policy that the "[l]aws applying to both Regulars and Reserves shall be administered without discrimination...." 10 USC § 10209. If Congress intended to leave such an enormous "jurisdictional gap" in Article 2, we are confident that a phrase other than "active duty" (which encompasses both regular and reserve components) would have been used, or it would have been expressly modified to designate any restrictions on eligibility for activation to stand trial for prior-service offenses.

We conclude that Articles 2(d), 3(a), and 3(d) should be read in harmony, in conjunction with RCM 204(d), as follows: First, Article 2(d) authorizes a reservist to be ordered to active duty to face trial by court-martial for both current-service and prior-service offenses, including offenses committed while a member of a regular component; second, when there has been a complete termination of military status, the version of Article 3(a) applicable to offenses occurring before October 23, 1992, permits a reservist, like a regular component member, to be tried for prior-service offenses only if the offenses cannot be tried in a civilian court and if confinement for 5 years or more is authorized for the offense; and third, Article 3(d) makes clear that the mere movement of a reservist on and off active duty does not terminate jurisdiction whenever a period of active duty terminates.

### 3. Jurisdiction In The Present Case

Both the prosecution and the defense have introduced substantial evidence on the issue of whether appellant's discharge from regular component service represented a complete break in service or whether the discharge was conditioned upon appellant's enlistment in the Reserves and was effected without a complete termination in service. Although the current version of Article 3(a) clearly provides for jurisdiction over prior-service offenses without regard to a break in service, the question whether there was a complete termination of service is important under the statutes and Manual provisions applicable to appellant's trial.

During further proceedings in this case, it will be necessary for the military judge to make findings of fact and conclusions of law specifically directed to the issue of termination of service. If there was such a complete break, then it will be necessary to consider whether the criteria of the applicable version of Article 3(a) have been met. For purposes of the present proceeding, however, we simply note that our ruling is without prejudice to introduction of further evidence and submission of additional legal arguments by either party at the court-martial on the legal and factual issues concerning the jurisdictional significance of whether there was a complete termination of appellant's military service.

### E. The Relationship Between Civilian Statutes Of Limitations And The Restrictions In Article 3(a)

■ Assuming that there was a complete termination of appellant's military service prior to his enlistment in the Reserves, the applicable version of Article 3(a) requires a determination as to whether: (1) the charged offenses were "punishable by confinement for five years or more"; and (2) appellant "cannot be tried [for the charged offenses] in the courts of the United States or of a State...."

Appellant was charged with rape, a capital offense under Article 120 of the Uniform

---

17. We note that the majority opinion in *Murphy v. Dalton* quoted this language in the introduction to its discussion of the legislative history but then did not cite or rely on it in the analysis of the legislative history. *See* 81 F.3d at 351.

Code of Military Justice.[18] Even if the charges are referred to a general court-martial that is not empowered to adjudge capital punishment, as in the present case, the offense of rape can be punished by confinement for life. *See* ¶ 45(e)(1), Part IV, Manual, *supra* (1995 ed.). This punishment clearly satisfies the first test—an offense punishable by confinement for at least 5 years—under the applicable version of Article 3(a).

The second test under that version of Article 3(a) requires a determination that appellant "cannot be tried [for the charged offenses] in the courts of the United States or of a State...." The first two specifications at issue in this case allege rapes at Fort Belvoir, Virginia, an area of exclusive federal jurisdiction. If tried in federal district court as a civilian offense, rape is a non-capital crime with a maximum punishment that includes confinement for life. *See* 18 USC § 2241(a). The relevant federal civilian statute of limitations provides:

> Except as otherwise expressly provided by law, *no person shall be prosecuted, tried, or punished* for any offense, not capital, unless the indictment is found or the information is instituted within five years next after such offense shall have been committed.

18 USC § 3282 (1994) (emphasis added).

The two alleged federal offenses took place in 1988, which is well beyond the 5–year period set forth in § 3282. Neither party has identified any statute that "expressly provide[s]" a different period of limitation for a trial in a federal civilian court in such circumstances.

The question before us is whether § 3282— which specifically provides that "no person shall be prosecuted, tried, or punished"— means that appellant "cannot be tried in the courts of the United States" for purposes of Article 3(a).

 An affirmative defense is a matter that "negative[s] guilt by cancelling out the existence of some required element of the crime ... [or that] show[s] some matter of

justification or excuse which is a bar to the imposition of criminal liability." W. LaFave & A. Scott, *Substantive Criminal Law* § 1.8(c) at 71 (1986); *see also* RCM 916. Although some courts have suggested that a statute of limitations provides an affirmative defense, *see, e.g., United States v. Ross,* 77 F.3d 1525, 1536 (7th Cir.1996); *Acevedo-Ramos v. United States,* 961 F.2d 305, 307 (1st Cir.), *cert. denied,* 506 U.S. 905, 113 S.Ct. 299, 121 L.Ed.2d 222 (1992), a statute of limitations does not establish a defense to the merits of a charge; rather, it is a limitation on the power of a prosecutor to bring charges and on the power of a court to try a case. *See Waters v. United States,* 328 F.2d 739, 743 (10th Cir.1964) (criminal statute of limitations is "not a mere limitation upon the remedy, but a limitation upon the power of the sovereign to act against the accused"); *United States v. Cooper,* 956 F.2d 960, 961–62 (10th Cir.1992) (statute of limitations is a "jurisdictional limitation upon the power to prosecute and punish"); *see also United States v. Hankin,* 607 F.2d 611, 615 (3d Cir.1979) (expiration of statute of limitations creates a "bar to the right of prosecution"); *Benes v. United States,* 276 F.2d 99, 109 (6th Cir.1960) (same).

We note that a number of federal civilian courts have held that a statute of limitations provides a waivable objection rather than an absolute bar to trial. *See, e.g., Acevedo-Ramos,* 961 F.2d at 307; *United States v. Karlin,* 785 F.2d 90, 92 (3d Cir.1986), *cert. denied,* 480 U.S. 907, 107 S.Ct. 1351, 94 L.Ed.2d 522 (1987); *United States v. Wild,* 551 F.2d 418, 421–25 (D.C.Cir.), *cert. denied,* 431 U.S. 916, 97 S.Ct. 2178, 53 L.Ed.2d 226 (1977). In all these cases, however, the offense, when charged, appeared to be within the statute of limitations, and the issue arose only as a result of subsequent developments, such as a plea to a lesser charge not within the statute or the introduction of evidence at trial taking the offense out of the statute of limitations. Moreover, appellant has not cited any case approving a prosecution initiated in the face of a clear and absolute time-bar to trial. In that regard, it is noteworthy that at

---

**18.** This matter will be considered in more detail, see 48 MJ at 178, with respect to the relationship between the statutory offense and the statute of limitations.

least one court has held that a guilty plea does not constitute waiver of the defense if "the indictment on its face shows that the limitations period has expired." *United States v. Helmich,* 704 F.2d 547, 548 (11th Cir.1983).

The Tenth Circuit, while agreeing that a statute of limitations may be waived, has stated that, "if the statute of limitations 'is to have any meaning in the administration of criminal justice, [it] must be held ... to operate as a jurisdictional limitation upon the power to prosecute and punish.'" *Cooper,* 956 F.2d at 962, *quoting Waters,* 328 F.2d at 743. The court noted that it used the term "jurisdictional," not in the sense of subject-matter jurisdiction, but in terms of the "plain language" of the statute which "operates as a bar to prosecution." 956 F.2d at 962. The court continued that "the filing of the information after the expiration of the statute of limitations is futile. Because the statute bars prosecution, the filing of the instrument which commences prosecution can have no effect," and "the charge against the defendant was a nullity." *Id.* at 963.

As noted in Part II.C.1., *supra,* the legislative history of Article 3(a) contains statements referring to Article 3(a) as applying in circumstances where civilian courts could not exercise "jurisdiction." The Tenth Circuit cases, which use the term "jurisdiction" in a colloquial rather than a formal sense, are useful in terms of putting these legislative comments in perspective.

As discussed in Part II.C.1., Congress enacted Article 3(a) to remedy the problem identified in *Hirshberg,* in which the Supreme Court interpreted the then-existing statutes and military practices as prohibiting a military trial for an offense committed during a prior term of service. The enactment of Article 3(a), as part of the UCMJ, was designed to permit courts-martial for prior-service offenses when the case involved a major offense that could not be tried in a civilian court. *See* Part II.C.1. Given that purpose, use of the word "jurisdiction" in the floor debates and committee reports provided a convenient description of cases that could not be tried in federal civilian court. It

is noteworthy that, even though Congress specifically used the word "jurisdiction" at several points in the drafting of other aspects of Articles 2 and 3, it did not use that word in the Article 3 criteria limiting court-martial jurisdiction over prior-service offenses, which it could have done by restricting military trials to cases outside the "jurisdiction" of civilian courts. Instead, the statute referred to cases that "cannot" be tried.

What is important about the federal civilian cases, regardless of each court's approach, is that they all appear to involve prosecutions brought in a good-faith belief that the charged offense fell within the statute of limitations. The federal civilian courts do not appear to have given affirmative approval to the knowing and intentional initiation of a prosecution barred by a statute of limitations. Absent evidence of federal civilian practice to the contrary, we conclude that a case in which a prosecution is barred under § 3282 is a case that cannot be tried in a civilian court under Article 3(a).

We hold, at this stage of the proceedings, that the plain language of § 3282 is sufficient to carry the Government's burden of demonstrating that appellant cannot be prosecuted in federal district court, and, therefore, he "cannot be tried in the courts of the United States" for purposes of Article 3(a). Given the procedural posture of this case, our determination is without prejudice to appellant's right at trial to bring additional information to bear on the question of whether a United States Attorney could initiate a prosecution for the applicable offenses notwithstanding the clear prohibition in § 3282.

With respect to the specifications concerning the charge of rape in the State of Illinois in 1987, neither party has cited applicable statutes or judicial decisions from the State of Illinois with respect to the offense, the statute of limitations, and the possibility of a prosecution under state law. Although we could rely upon judicial notice to reach our own conclusions as to these matters, we do not believe it would be desirable to do so at this stage of the proceedings in the absence of focused litigation by the parties or a definitive ruling by the military judge. We simply

note that our decision is without prejudice to either party's right at trial to bring additional information to bear on the question, under Article 3(a), of whether this particular rape cannot be tried in state or federal court.

## III. APPLICATION OF ARTICLE 43, THE STATUTE OF LIMITATIONS UNDER THE UNIFORM CODE OF MILITARY JUSTICE

■ In addition to presenting his jurisdictional arguments, appellant moved to dismiss the court-martial charges on the ground that they were barred by the 5–year statute of limitations in Article 43(b)(1), which provides:

> Except as otherwise provided in this section (article), a person charged with an offense is not liable to be tried by court-martial if the offense was committed more than five years before the receipt of sworn charges and specifications by an officer exercising summary court-martial jurisdiction over the command.

The Government responded by noting that rape may "be punished by death or such other punishment as a court-martial may direct," Art. 120(a),[19] and that "any offense punishable by death may be tried and punished at any time without limitation," Art. 43(a). Appellant replied by contending that the particular offenses charged could not be punished by death, citing RCM 1004(c) (which limits the aggravating factors that may be used to support imposition of the death penalty),[20] Article 55 (which prohibits "cruel or unusual punishment"), and the Supreme Court's decision in *Coker v. Georgia,* 433 U.S. 584, 592, 97 S.Ct. 2861, 2866, 53 L.Ed.2d 982 (1977) ("with respect to rape of an adult woman"). The military judge denied appellant's motion to dismiss, relying on the relationship between the statute of limi-

tations in Article 43 (excluding offenses "punishable by death") and the punishment for the underlying offense in Article 120 (rape may be "punished by death"). The military judge further noted that "[t]he question of whether the death penalty may be imposed, given the facts and circumstances of any particular case, does not control the statute of limitations issue." We agree.

### A. Background

Article 43(a), when enacted as part of the Uniform Code of Military Justice in 1950, did not refer to "offenses punishable by death" but, instead, contained a list of specific offenses exempt from the statute of limitations:

> A person charged with desertion or absence without leave in time of war, or with aiding the enemy, mutiny, or murder, may be tried and punished at any time without limitation.

For certain designated offenses, including rape, Article 43(b) provided a 3–year statute of limitations. For all other offenses, Article 43(c) provided a 2–year statute of limitations.

In significant respects, the military statute proved to be more limited than the parallel provisions in title 18 applicable in federal civilian trials, which provided a general 5–year statute of limitations (§3282), a general exception for all offenses punishable by death (§3281), and a flexible provision permitting reinstitution of charges within 6 months after dismissal of a defective indictment, even if the basic statute of limitations had expired (§3288).

In 1986, Congress approved amendments to the UCMJ which, in the words of the Senate Armed Services Committee, were intended to "reform the statute of limitations provisions now contained in the UCMJ and bring those provisions more in line with federal criminal code provisions (See Chapter

---

**19.** Congress has not made rape a capital offense as a matter of federal civilian law. Under federal civilian statutes, the maximum punishment is life imprisonment. *See* 18 USC §§ 2241 and 2242.

**20.** One of the limitations on capital punishment in courts-martial is that the death penalty may not be adjudged unless the court members find

the existence of one of the aggravating factors listed in RCM 1004(c). With respect to rape, RCM 1004(c)(9) provides two aggravating factors—that "[t]he victim was under the age of 12" or "[t]he accused maimed or attempted to kill the victim." There are other aggravating factors under RCM 1004(c) that do not expressly exclude application to rape, but they are not at issue in this case.

213 of title 18, United States Code)." S.Rep. No. 331, 99th Cong., 2d Sess. 249 (1986). With respect to Article 43(a), the Senate Committee Report stated:

> Under the committee provision, no statute of limitations would exist in prosecution of offenses for which the death penalty is a punishment prescribed by or pursuant to the UCMJ or of the offenses of absent without leave in time of war or missing movement in time of war.

*Id.* The Report also explained that the legislation would increase the general period of limitations to 5 years and that it would permit reinstitution of charges dismissed "as defective or insufficient, even if the statute of limitations" had run. *Id.* at 249–50.

### B. Discussion

Appellant relies on developments in the field of capital litigation between enactment in 1950 of the original version of Article 43 and the 1986 amendments to that statute. In *United States v. Matthews,* 16 MJ 354, 377 (1983), this Court held that, in light of the Supreme Court's limitations on the death penalty under the Eighth Amendment's prohibition against "cruel and unusual punishments," and in view of the parallel prohibition against "cruel or unusual punishment" in Article 55, the death penalty could be imposed under the Code only if procedures were established to "ensure that the death penalty is not meted out arbitrarily or capriciously." Subsequently, in 1984, the President issued detailed capital sentencing procedures, *see* RCM 1004, which included a requirement that the court members unanimously find the presence of at least one of the aggravating factors designated in RCM 1004(c) for the death penalty to be adjudged, *see* RCM 1004(b)(7). The effect of the Rule was to change the capital sentencing process from one in which any statutory offense denominated as capital could result in a death sentence to one in which such a denominated offense could result in a death sentence only if the case presented the aggravating factors set forth in the RCM 1004(c). Under the new procedures, a rape conviction could not result in a death sentence unless the victim was under the age of 12 or the accused maimed or attempted to kill the victim. *See* n. 20, *supra.*

Appellant contends that because the amendments to Article 43 were enacted after RCM 1004, the phrase "punishable by death," which is set forth in Article 43's list of offenses exempt from the statute of limitations, necessarily refers only to cases in which RCM 1004(c)'s regulatory aggravating factors are present. We do not agree. Such an interpretation would result in the restriction of the statute of limitations for murder, as well as the other offenses for which Congress has authorized the death penalty, to 5 years unless the Government could prove the existence of one of the aggravating factors set forth in RCM 1004(c). Appellant's reasoning also would produce the following anomaly: There would be a 5–year statute of limitations for murder and all other serious offenses denominated by Congress as "punishable by death" unless aggravating factors could be proved by the Government in the face of a motion to dismiss; but there would be no statute of limitations for the two offenses specifically listed in Article 43 (absence without leave and missing movement in time of war), even though those offenses were not denominated by Congress as "punishable by death."

The clear purpose of the 1986 amendments to Article 43, as reflected in the legislative history and the text of the amendments, was to expand the circumstances in which a servicemember would be subject to trial by court-martial in light of parallel developments in the civilian sector. There is no indication in the legislative history that Congress, by using the phrase "punishable by death," intended to change the statute of limitations for murder from complete exemption to a mere 5 years. Likewise, there is no indication that Congress intended to exempt in all cases absence without leave and missing movement in time of war from the statute of limitations without regard to the presence of aggravating factors, on the one hand, but to exempt murder and other serious offenses only upon proof of the existence of regulatory aggravating factors, on the other hand.

The exemption from Article 43 for offenses "punishable by death" was meant to apply to the most serious offenses without listing each one in the statute, no more, no less. Our position is consistent with that taken by other Federal Courts of Appeals that have addressed the meaning of the phrase "punishable by death" in the context of the civilian statute of limitations. For example, in *United States v. Manning,* 56 F.3d 1188, 1195 (1995), the Ninth Circuit held that the crime of murder by mail bomb was "punishable by death" and therefore exempt from the statute of limitations, even though the death-penalty provisions of the statute under which the defendant was convicted were later held unconstitutional. We agree with the Ninth Circuit's explanation that "the statute of limitations provisions ... are inextricably tied to the nature of the offense. Congress has made the judgment that some crimes are so serious that an offender should always be punished if caught." *Id.* at 1196; *accord Coon v. United States,* 411 F.2d 422, 424 (8th Cir.1969) (offense was a "capital offense" within the meaning of §§ 3281 and 3282 even though "the Government did not request," and "the jury did not assess," the death penalty); *cf. United States v. Watson,* 496 F.2d 1125, 1127–28 (4th Cir.1973) (offense of first-degree murder was "still a 'capital crime'" for purposes of appointing counsel notwithstanding the Supreme Court's invalidation of the death penalty in *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972)).

We hold that rape is an "offense punishable by death" for purposes of exempting it from the 5–year statute of limitations of Article 43(b)(1). Therefore, the charges against appellant are not time-barred.

## IV. CONCLUSION

In light of our discussion of the jurisdictional and statute-of-limitations issues raised by appellant, we conclude that appellant is not entitled to relief.

The decision of the United States Army Court of Criminal Appeals denying the petition for extraordinary relief is affirmed. The record of trial is returned to the Judge Advocate General of the Army for remand to the military judge for further proceedings. The order of this Court staying appellant's court-martial proceedings is vacated.

Chief Judge COX and Judges SULLIVAN, CRAWFORD, and GIERKE concur.